(2008)
UNITED STATES of America, Plaintiff,
v.
Daniel PEREZ-MELENDEZ & Angel Rivera-Rios, Defendants.
Crim. No. 07-417 (FAB).
United States District Court, D. Puerto Rico.
August 8, 2008.

OPINION AND ORDER
BESOSA, District Judge.
On April 30, 2008, a jury convicted Daniel Perez-Melendez ("Perez-Melendez") and Angel Rivera-Rios ("Rivera-Rios") of aiding and abetting each other to possess with intent to distribute five kilograms or more of cocaine in violation of 21 USC § 841(a)(1), (b)(1)(A) and 18 USC § 2. Subsequently, on May 6, 2008, Perez-Melendez filed a motion for a judgment of acquittal (Docket No. 117). That same day, co-defendant Rivera-Rios filed a motion "to join" Perez-Melendez's motion requesting acquittal (Docket No. 118). On May 22, 2008, the USA filed a brief opposition (Docket No. 121).

I. Factual Background

A. October 11, 2007
In the afternoon of October 11, 2007, Alcohol Tobacco and Firearms ("ATF") task force agent Luis Crespo ("Crespo")received a tip from a confidential informant concerning a white, international brand truck containing cocaine. The agent also informed Crespo that he could find the truck in an "industrial zone" and that someone would drive the truck to a second location at which point it would be robbed. Following the tip, Crespo and a fellow agent found the truck and followed it from Doral Freight in Amelia Industrial Park to a parking lot in Caguas. Crespo called in additional agents. The white truck stopped at the Farmer's Market ("Plaza de Mercado") in Caguas, at which point task force agents intervened.[1]
The truck had two occupants: Perez-Melendez, the driver, and Rivera-Rios, the passenger. After receiving Perez-Melendez's consent, the task force agents conducted an initial search of the truck. The back of the truck contained six pallets stacked with what appeared to be reams of paper. A dog trained to detect controlled substances then identified some of the pallets as potentially containing controlled substances. Once the canine identified some of the pallets, the task force agents sought and received a search warrant, at which point the truck was taken to the Drug Enforcement Agency ("DEA") office. The truck was unloaded at the DEA Office. All of the pallets were searched and one was found to contain approximately 40 kilos of cocaine artfully concealed within what appeared to be packages of paper. The search of the truck did not reveal any manifesto, invoice or other document indicating the final destination of the truck's cargo.

B. Conflicting accounts provided by defendants
Neither Perez-Melendez nor Rivera-Rios testified at trial. While, of course, no negative inference may be drawn from their decision not to testify, they forewent the opportunity to qualify or controvert damaging admissions they made to task force members subsequent to their stop.
ATF Special Agent Maya Sumalla ("Sumalla") interviewed Perez-Melendez at the scene of the stop. Perez-Melendez told Sumalla that he was a self-employed truck driver although he did not own a truck or any other vehicle.[2] He also said that he had known the passenger, Rivera-Rios, for three years. When asked for the passenger's name, however, he only recalled that it began with the letter "A". Perez-Melendez also referred to the passenger as his assistant. Sumalla then searched through Perez-Melendez's cell phone, with his permission, and found a phone call from an individual named Angelo. Sumalla then asked Perez-Melendez about Angelo, and Perez-Melendez identified Rivera-Rios as Angelo, the passenger in the truck.
Perez-Melendez told Sumalla that he received a call from Angelo at 9:00 AM that same day in which Angelo asked him to provide his services as a truck driver. He said that he met Angelo at a gas station in Catano where he found Angelo waiting for him with a rented truck. Sumalla testified that Perez-Melendez changed his story a couple of times. For example, Perez-Melendez also said that he himself rented the truck from a friend, but then he returned to his original story that Angelo was waiting for him at the gas station with the rented truck: Perez-Melendez went on to tell Sumalla that he received instructions from Angelo, who told him first to head to a warehouse in Catano and then told him to go to a warehouse in Caguas. He added that employees at the first warehouse used a forklift to load six pallets of what he believed to be paper into the truck.
Sumalla noted that Perez-Melendez also switched his story in regards to providing him with directions. First, Perez-Melendez told Sumalla that he received instructions from Angelo the entire time. Then, Perez-Melendez said that once the truck exited the expressway, Perez-Melendez received calls from a private caller on his cellphone and that this individual, who was unknown to him, gave him instructions as to where to go and what to do with the truck. Perez-Melendez said that he did not question the caller. Perez-Melendez told Sumalla that he had received calls from the same unknown individual on other occasions when he did similar jobs. Perez-Melendez later changed his story once again, saying that he had not received any calls from an unknown individual that day but that Angelo might have received such a call with instructions.
At a separate point in the interview, Perez-Melendez said that he had done jobs for Angelo in the past. He added that Angelo would pay him $100 per job. Sometimes he would pay prior to the job, and sometimes at the conclusion of the job. He said he had not yet been paid for the job he was performing when he was stopped. Then again, later in the interview, Perez-Melendez said that the day he was stopped was the first time that he had worked for Angelo.
Later, Perez-Melendez and Rivera-Rios were brought to the ATF's office. While there, another task force member, Marcos Rodriguez-Mercado ("Rodriguez-Mercado"), spoke with Rivera-Rios after Rivera-Rios signed a form which advised him of his Miranda rights. Rivera-Rios told Rodriguez-Mercado that the truck belonged to a friend of his, Roberto Morales.[3] He also said that he received a call from another friend that he identified only by a first name, David, in which David requested that Rivera-Rios pick up and deliver the "merchandise." Rivera-Rios said that he then went to pick up the merchandise from an industrial park in Guaynabo and that he would deliver it wherever he was told to do so.
Rivera-Rios told Rodriguez-Mercado that he had made a delivery on another occasion for David. On that occasion he went to Trujillo Alto and transferred his merchandise from one truck to another truck. Rodriguez-Mercado testified that Rivera-Rios said he was paid approximately $400 on that occasion.
Rivera-Rios told a similar, but not identical, story to Eduardo Alamo-Ramos ("Alamo-Ramos"), a DEA task force member. Alamo-Ramos testified that Rivera-Rios told him that on the day he was stopped, he received a phone call from a man whose name he did not know. That man asked if he was available to deliver a shipment to an unspecified location in Caguas. Rivera-Rios accepted the offer and then contacted Roberto Morales to borrow Mr. Morales's truck. Rivera-Rios then contacted Perez-Melendez to drive the truck because Rivera-Rios's "heavy" license had expired.
Rivera-Rios told Alamo-Ramos that he and Perez-Melendez traveled to Doral Freight in the industrial park, where they picked up the six pallets. The two defendants were then expected to drive to a location in Caguas where they would receive final instructions concerning the truck's final destination. Rivera-Rios told Alamo-Ramos that in July or August of 2007 he had made one prior delivery to a location in Trujillo Alto where the merchandise was off-loaded from one truck to another. He was paid $400 for that delivery.

C. Doral Freight Logistics
Virginia Maria Cruz-Martinez ("Cruz-Martinez"), a customer service employee for Doral Freight Logistics ("Doral"), testified concerning Doral's operations and her interactions with the defendants. First, she confirmed that Doral is located in Amelia Industrial Park in Guaynabo. Part of Doral's business, she explained, is carrying merchandise from the Dominican Republic to Puerto Rico, as well as from Puerto Rico to the Dominican Republic, St. Thomas and St. Croix. Cruz-Martinez's duties include processing papers, such as customs and treasury department forms, for shipments from the Dominican Republic to Puerto Rico and vice versa.
To transport merchandise from the Dominican Republic to Puerto Rico, Doral packs merchandise inside the van of a shipping company. That van is then sealed and placed on a boat to Mayaguez, Puerto Rico. The merchandise is then transported from Mayaguez to Doral's facilities in Barrio Amelia. Doral then sends the manifesto with all of the shipments received to customs and the Treasury Department. Once customs and Treasury have cleared a shipment, Doral notifies its client that the merchandise is available and asks whether the client will pick up the merchandise or have it delivered by Doral. Cruz-Martinez estimated that half of the shipments are delivered by Doral and half are picked up by the clients. When Doral makes the delivery it does so using independent drivers. The cost for delivering a load varies; Cruz-Martinez estimated that a delivery to Caguas was approximately $75, whereas a delivery to Mayaguez was approximately $250.
From May 2007 to October 2007, a Dominican company named Industria de Sobres Dominicanos ("IDD") sent six shipments to an entity named Industrial Paper, in Puerto Rico. The shipments were all reported as reams of paper. Each shipment was picked up by Industrial Paper, rather than delivered. Cruz-Martinez identified the defendants as the two individuals who picked up four of the six shipments that were dispatched while she was working including the shipment picked up on October 11, 2007. The other two shipments, she explained, were dispatched when she was on vacation.[4]

II. Standard for a motion for acquittal
A court may enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. FED. R.CRIM.P. 29(a). A defendant may move the court for a judgment of acquittal after the close of the government's case or at the close of all evidence. Id. Courts may reserve decision on the motion, submit the case to the jury, and decide upon the motion before or after the jury returns a verdict of guilty. FED.R.CRIM.P. 29(b). A defendant may move for judgment of acquittal within seven days after a guilty verdict or after the discharge of the jury, whichever is later. FED.R.CRIM.P. 29(c)(1). In this case, defendants made a Rule 29 motion at the close of evidence and they renewed the motion in writing following the jury's guilty verdict.
In reviewing a motion for judgment of acquittal courts must consider the evidence "in the light most favorable to the prosecution" and determine whether the "body of proof, as a whole, has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt." U.S. v. Lara, 181 F.3d 183, 200 (1st Cir.1999) (citations omitted). This standard requires the resolution of all evidentiary disputes and credibility questions in favor of the government; the Court must also draw all reasonable inferences in favor of the government's case. Id. Thus, the jury's verdict stands unless the evidence could not have persuaded a rational trier of fact of the defendants' guilt beyond a reasonable doubt. U.S. v. Soler, 275 F.3d 146, 151 (1st Cir.2002) (citing Lara, 181 F.3d at 200).

III. Discussion

A. Proof of knowledge
Defendants argue that the government failed to prove the element of knowledge; specifically, defendants argue that they had no knowledge of the presence of narcotics. Instead, they argue, the evidence presented by the government amounts to showing nothing more than their "mere presence" at the scene of the crime, which is insufficient to support their convictions. To support their proposition, defendants cite and discuss in some detail United States v. Mehtala, 578 F.2d 6 (1st Cir. 1978) and United States v. Guerrero, 114 F.3d 332 (1st Cir.1997). While instructive as to the "mere presence" defense, neither of these cases necessitate a judgment of acquittal in this case.
In Mehtala, the First Circuit Court of Appeals reversed the conviction of the appellant for aiding and abetting the knowing and intentional importation of marijuana in violation of 21 U.S.C. § 963. 578 F.2d at 10. There the Court found that the government failed to prove any one of three elements necessary to support the appellant's conviction. Id. at 9. The appellant, a 20-year old college graduate in marine biology at the time of her arrest, had embarked upon a three-and-a-half month adventure through the Caribbean. Id. At trial, the government's evidence consisted of eye witness testimony that objects, which turned out to be six packages of marijuana, were seen floating twenty-five to fifty yards astern of the ship upon which the appellant was a passenger. The government also presented evidence suggesting a close relationship between the appellant and the ship's captain. Id. at 10. On the whole, the government presented no evidence that the appellant in any way associated herself with or participated in the criminal venture, no evidence that she took any affirmative action to further the venture, no evidence that she had any control over the operation of the ship or its cargo, no evidence that she embarked upon the voyage for any reason other than to take a pleasure cruise, no evidence of a prior association with the captain, no evidence of use of marijuana, nor any evidence of previous participation in drug operations. Id. On the whole, the Court found that the government failed to prove its case-in-chief. Id.
In Guerrero, the second case discussed by defendants, the First Circuit Court of Appeals rejected appellants' argument that their mere presence on a ship carrying drugs was insufficient to establish that they knew the cargo aboard ship contained drugs. 114 F.3d at 341. There, defendants argued that the government did not prove they had knowledge that they were transporting drugs where the drugs were concealed in numerous bales covered in white plastic, which emitted no odor of marijuana. Id. at 342. The Guerrero court, however, "eschewed" a "myopic inquiry into whether `one particular indicator of knowledge (such as smell) did, or did not exist.'" Id. (citation omitted). Instead, the Court noted that it had previously considered numerous non-exclusive factors in similar cases such as the closeness of a crew's relationship, the length of a voyage, the size and condition of a vessel, the quantity of marijuana, and the absence of a legitimate purpose for the voyage. Id. In Guerrero, the ship in question had a low profile construction allowing it to avoid detection. Id. at 343. It was also equipped with expensive and sophisticated radio and navigational gear and disproportionately large fuel tanks. Id. The bales were so ubiquitous that they left no space for the crew to stand or sit within the ship's cabin. Id. The crew in Guerrero also emerged from their cabin area with their belongings in hand when approached by the Coast Guard, permitting the inference that they knew they had been caught in an illegal venture. Id. On the whole, the Court held that the circumstantial evidence presented supported a reasonable inference that the crew knowingly participated in the venture, or at least that the crew was deliberately ignorant. Id. at 342-43.
As in Guerrero, the circumstantial evidence presented in this case supports the reasonable inference that the defendants knew that they were transporting cocaine, or at the very least, were willfully blind to the drugs contained within the pallets of paper. Although both plaintiffs told law enforcement officials that they had only made one other pick up from Doral, Cruz-Martinez testified that they had in fact made three other pickups of shipments by IDD to Industrial Paper. This not only shows prior participation by the defendants in criminal endeavors, but it also raises the inference that the defendants prevaricated concerning their prior involvement. This is not the only time that defendants may have prevaricated; as Sumalla testified that Perez-Melendez repeatedly changed his story when he was interviewed. For example, he went from calling Rivera-Rios his assistant and not remembering his name, to calling him Angelo and saying that he had done jobs for him in the past, to finally saying that the day he was stopped was the first time he did a job for him. A second example is that Perez-Melendez changed his story as to who provided him with directions to Caguas. First Perez-Melendez said that it was Rivera-Rios who gave him instructions, then he said that he received directions from an unknown person via cellular phone, and lastly he said that he did not receive calls but that Rivera-Rios might have received a call with directions. Rivera-Rios changed his story as well. He told agent Rodriguez-Mercado that a friend named David asked him to pick up merchandise, whereas he told agent Alamo-Ramos that an unknown man asked him to make the pickup. The inconsistencies in defendants' recollections of events when speaking to law enforcement raise the inference that they lied to conceal their knowledge of the illegal nature of the activity in which they were involved.
More troublesome still for defendants is their explanation, or more succinctly, their lack of explanation, to law enforcement of certain details concerning the delivery job. Defendants did not know where they were to deliver the merchandise other than to somewhere in Caguas. They may have been provided the Caguas location only once they were en route. Defendants also may not have known who hired them, unless it was Rivera-Rios's friend David. The one job that Rivera-Rios remembered doing for the same client, was one in which defendants picked up merchandise only to transfer it to another truck. It seems almost silly to mention that defendants had no manifesto, receipt or other paperwork related to the delivery they were making. All of these details raise additional questions such as who accepts jobs from an unknown individual to deliver to an unknown location? Another question is why hire a truck and driver to deliver a shipment if the shipment is only to be delivered to another truck rather than a fixed location? These questions beg for answers. The implausible nature of the delivery jobs, as described by defendants to law enforcement, suggests that defendants closed their eyes to the criminal activity in which they were involved. See, e.g., U.S. v. St. Michael's Credit Union, 880 F.2d 579, 585 (1st Cir.1989) ("willful blindness instruction `allows the jury to impute knowledge to a defendant of what should be obvious to him, if it found, beyond a reasonable doubt, a conscious purpose to avoid enlightenment.'") (citing United States v. Zimmerman, 832 F.2d 454, 458 (8th Cir.1987)). It also allows the inference that defendants knew they were involved in transporting drugs because a legitimate business would not typically act as the defendants did or as their mysterious client did in this case. See Guerrero, 114 F.3d at 342-44 (describing unusual circumstances surrounding the use of a recreational craft to transport concealed drugs as evidence of an illegitimate purpose); c.f., U.S. v. Hurley, 63 F.3d 1, 11-12 (1st Cir.1995) (holding, in part, that a rational jury could infer that a defendant in a money laundering conspiracy case knew the source of funds were drugs because of the size and continuing nature of the cash shipments).
The fact that the drugs were artfully concealed within reams of paper and that the plaintiffs told law enforcement that they were not paid an unusually excessive amount in the past (between $100 and $400) are not outcome determinative. See, e.g., Guerrero, 114 F.3d at 342-44 (upholding conviction where drugs were concealed within bales); United States v. Cuevas-Esquivel, 905 F.2d 510, 514 (1st Cir.), cert. denied, 498 U.S. 877, 111 S.Ct. 208, 112 L.Ed.2d 169 (1990) (upholding the conviction of a defendant who testified that he was only paid $33 to be a crew member on board a boat carrying marijuana); United States v. Steuben, 850 F.2d 859, 862, 866 (1st Cir.1988) (upholding the conviction of a defendant who said he was paid only $300 to be a crew member on a boat carrying marijuana). "It is not necessary for the government to disprove every reasonable hypothesis of innocence, provided that the record as a whole supports a conclusion of guilt beyond a reasonable doubt." Cuevas-Esquivel, 905 F.2d at 514. Here the government provided sufficient evidence, including reasonable inferences, that when considered as a whole, warrant the jury's conclusion that the defendants were guilty beyond a reasonable doubt.

B. Objection to the willful blindness instruction
Defendant Perez-Melendez renews his objection to the Court's use of a willful blindness instruction in this case. A willful blindness instruction is warranted where (1) the defendant claims a lack of knowledge; (2) the evidence would support an inference that the defendant consciously engaged in a course of deliberate ignorance; (3) the proposed instruction as a whole could not lead the jury to conclude that an inference of knowledge was mandatory. U.S. v. Gabriele, 63 F.3d 61, 67 (1st Cir.1995). Perez-Melendez argues that the evidence here does not support the inference that he consciously engaged in a course of deliberate ignorance. He states that because he was hired by Rivera-Rios, his lack of knowledge concerning the destination for the merchandise as well as the primary client is irrelevant. His selective use of his own admissions, however, provides a false picture of the trial record.
While Perez-Melendez said at one point that he had been contacted by Rivera-Rios and was working for him for the first time, he also said that he had done other jobs and that he himself spoke with the unknown client on other occasions. The defendant conveniently ignores this part of the testimony. He also ignores the testimony of Cruz-Martinez that he retrieved at least four shipments from Doral. To operate under circumstances as suspicious as those described above and to return on at least four different occasions supports the inference that Perez-Melendez consciously engaged in a course of deliberate ignorance. Accordingly, the Court overrules Perez-Melendez's objection.

IV. Conclusion
For the reasons discussed above, defendants motion for judgment of acquittal is DENIED.
IT IS SO ORDERED.
NOTES
[1] Task force agents also stopped three additional cars, which they spotted following the white international truck on the highway. The three cars, a Plymouth, a Chevrolet and a Nissan, had all been identified to Agent Crespo, as had their drivers, by his confidential informant. The confidential informant appears not to have identified Perez-Melendez to Crespo. (T. at p. 29.)
[2] Sumalla noted that Perez-Melendez did not have any money on his person or in his wallet. When asked about how he would get home that night, Perez-Melendez responded that he did not know and that he would just live wherever he could find a place to sleep.
[3] Rodriguez confirmed via a vehicle database that Rivera-Rios was not the owner of the white truck but he could not remember if Roberto Morales was in fact the owner.
[4] The four bills of lading that correspond to the shipments that were dispatched while Cruz-Martinez was on duty contain Angel Rivera's signature twice, a signature from a Raul Rivera, and one in which the first name is illegible but the last name is Melendez Perez.