# United States Court of Appeals
## For the First Circuit

No. 08-2225

UNITED STATES OF AMERICA,
Appellee,

v.

DANIEL PÉREZ-MELÉNDEZ,
Defendant, Appellant.

No. 08-2226

UNITED STATES OF AMERICA,
Appellee,

v.

ÁNGEL RIVERA-RÍOS,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Francisco A. Besosa, U.S. District Judge]

Before
Torruella, Lipez, and Howard,
Circuit Judges.

Lydia Lizarríbar-Masini, for appellant Rivera-Ríos.
María Soledad Ramírez-Becerra, for appellant Pérez-Meléndez.
Ernesto López-Soltero, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Luke Cass, Assistant United States Attorney, were on brief for appellee.

March 17, 2010

**TORRUELLA**, **Circuit Judge**. This is a consolidated opinion addressing two related appeals. Each appeal arises from criminal convictions stemming from events of October 11, 2007, when Daniel Pérez-Meléndez ("Pérez-Meléndez") and Ángel Rivera-Ríos ("Rivera-Ríos") (collectively "appellants") were transporting what law enforcement officials discovered to be forty kilograms of cocaine. After careful review of the record, because we find that the evidence adduced at trial was insufficient to support the jury verdict, we reverse the district court's rulings and remand the case to the district court with instructions to enter judgments of acquittal.

## I. Background

### A. Facts

We outline the facts relevant to the appeals. Other details may be found in the district court's opinion. See United States v. Pérez-Meléndez, 571 F. Supp. 2d 322 (D.P.R. 2008).

### 1. Doral Freight Logistics

When she testified at trial, Virginia María Cruz-Martínez ("Cruz-Martínez") had been a customer service employee for three years at Doral Freight Logistics ("Doral"), a Caribbean shipping company based in Amelia Industrial Park in Guaynabo, Puerto Rico. Cruz-Martínez testified that shipments from the Dominican Republic come to Doral via a sealed van on a boat that docks at Mayaguez, Puerto Rico, and then are driven by the shipper to Doral's

-2-

headquarters in Guaynabo. Cruz-Martínez stated that when such a van arrives at Doral, the manifest that is included with the shipment is sent to the Customs and Treasury departments for the appropriate clearances. Once the clearances are returned to Doral, Doral notifies the client that the merchandise is available and provides the client with the option of either picking up the merchandise or having Doral deliver it. If the client opts to pick up the merchandise and sends truck drivers to do so, Doral verifies that all clearances have been obtained and then provides the driver with a receipt to sign. Doral then gives the driver a copy of the receipt and a copy of the manifest, the latter of which "states all the shipments that are inside the van." If the client opts to have Doral deliver the merchandise, Doral hires "independent drivers" and pays them based on the size of the load and the distance to the destination. Cruz-Martínez said that Doral would pay a driver approximately $70-$100 to deliver a load to Caguas, approximately $200 to deliver a load to Ponce, and approximately $250 to deliver a load to Mayaguez.

According to Cruz-Martínez, Industria de Sobres Dominicanos, S.A. ("ISD"), a company in the Dominican Republic, sent six shipments of wrapped pallets of reams of paper to Doral between May and October of 2007, to be ultimately delivered to another company, Industrial Paper, in Puerto Rico. Cruz-Martínez testified that it is not Doral's company policy to unwrap such

-3-

pallets to open them. Usually, ISD would pay for its shipment by money order before pick-up, but on one occasion, Cruz-Martínez said, "the truck drivers" may have paid during pick-up. Cruz-Martínez stated that someone identifying himself as José Albarrán ("Albarrán") would call on behalf of ISD to provide instructions about when the shipment would be sent and picked up, and to inquire about the status of the clearance. Cruz-Martínez said she never met Albarrán in person, having dealt with him only over the telephone.

Cruz-Martínez testified that she was present at work for four of the six shipments ISD sent to Doral for Industrial Paper, and that appellants picked up all four of them. These shipments were dated May 15, June 9, August 18, and October 6 as the dates of departure from the Dominican Republic. Cruz-Martínez further testified that Rivera-Ríos signed for three of the shipments but that he twice indicated his first name was "Ángel" and the third time indicated it was "Raúl." Cruz-Martínez stated that the signature on the fourth receipt -- dated October 11, 2007 as the pick-up date -- was difficult to read but that she thought that the first name was "Raúl," "David," or "Daniel," and the last name was "Meléndez-Pérez."

## 2. Vehicle Identification

On October 11, 2007, at approximately 1:30 p.m., Luis Crespo ("Crespo"), an Alcohol, Tobacco, Firearms, and Explosives

-4-

("ATF") Task Force Agent of the Puerto Rico Police Department, and another ATF Task Force Agent received a telephone call from a confidential source. The source reported that a white truck located in Amelia Industrial Park behind R.J. Reynolds contained "some kilos" of cocaine intended for shipment. The source further reported that three people were planning to rob the truck of its contents, and provided the names of these individuals and the makes, models, and license plate numbers of the vehicles they would be driving. The source did not provide Pérez-Meléndez's name.[1] Crespo notified his superiors and then went to the designated area with the purpose of finding the truck, which he did. Crespo followed the truck from Amelia Industrial Park to the Plaza del Mercado, the farmer's market area, of Caguas, where the truck stopped and ATF agents, including Crespo, approached it. The ATF agents told the truck driver, Pérez-Meléndez, and the only passenger, Rivera-Ríos, to exit the vehicle.

### 3. Vehicle Search

At 3:15 p.m., Pérez-Meléndez provided handwritten consent to ATF and Drug Enforcement Agency ("DEA") agents to search the truck. Pérez-Meléndez wrote the consent in Crespo's presence and signed it, along with a different ATF agent and a DEA agent. The agents then searched the truck, in which they found what appeared

---

[1] Crespo was not asked during trial whether the confidential source provided Rivera-Ríos's name.

to be six pallets of paper wrapped in plastic. After not detecting any narcotics themselves, the agents called the K-9 Division of the Puerto Rico Police Department, which sent a dog that was trained to detect the presence of controlled substances. After being commanded to search the contents of the truck, the dog indicated, by scratching with his front paws, the possibility that drugs were in some of the pallets.

Later that day, Crespo and other agents sought a search warrant to search the truck, as identified by its license plate number, model, color, and Vehicle Identification Number. During that process, the truck was taken to the DEA's High Intensity Drug Trafficking Area office in Hato Rey. After a judge authorized the search warrant at 11:38 p.m. and until around 3:00 a.m. the following day, Crespo and other agents unloaded and searched the pallets of paper, discovering what amounted to forty kilograms of cocaine. Expert witnesses for the government testified at trial about the specific characteristics and value of the cocaine. One expert stated that the shipment was cocaine hydrochloride, 70.4 percent pure, with a net weight of 20.02 kilograms. Another expert stated that the value of the cocaine was, per kilogram, $16,000 wholesale or $40,000 retail, for a total street value of $1.6 million. Crespo and other agents were not able to determine the cargo's destination either during their fourteen-hour intervention or by the time Crespo testified on April 28, 2008.

### 4. Appellants' Questioning

Neither appellant testified at trial. As such, "no question is raised about what inferences a jury may rationally draw from its observation of [their] testimony." United States v. Nieves-Castaño, 480 F.3d 597, 601 (1st Cir. 2007). However, both appellants were questioned on October 11, 2007.

### a. Pérez-Meléndez Questioning

During the intervention in Caguas, ATF Special Agent Mayea Sumalla ("Sumalla") and ATF Special Agent Salez Núñez advised Pérez-Meléndez of his Miranda rights, after which Pérez-Meléndez signed a written waiver of those rights and submitted himself to questioning while seated inside a government vehicle. Pérez-Meléndez told the agents that he was a self-employed truck driver who did not own the truck he was driving that day or any other vehicle. Pérez-Meléndez stated he had known the passenger of the truck for about three years but could not tell the agents his name, although he said he believed it started with the letter "A." Pérez-Meléndez then consented to a search of his cell phone, which revealed calls from someone named "Ángelo," whom Pérez-Meléndez identified as Rivera-Ríos. Pérez-Meléndez reported that he received a telephone call from Rivera-Ríos that morning at 9:00 a.m., during which Rivera-Ríos asked Pérez-Meléndez if he could work as a truck driver that day. Between 2:00 p.m. and 3:00 p.m., Pérez-

Meléndez had a friend drop him off at a gas station in the Cataño area, where he met Rivera-Ríos.

According to Sumalla, Pérez-Meléndez contradicted himself on at least three issues. First, Pérez-Meléndez offered inconsistent statements "several times" about whether he or Rivera-Ríos rented the truck. At one point during the questioning, Pérez-Meléndez said that Rivera-Ríos had rented the truck, and was already waiting for him with it when they met at the gas station. At another point, Pérez-Meléndez stated that he himself had rented the truck, from a friend.

Second, Pérez-Meléndez offered inconsistent statements "several times" about who provided instructions to him on where to drive and what to do. At one point during the questioning, Pérez-Meléndez stated that Rivera-Ríos gave him instructions the entire time. Rivera-Ríos allegedly told him the specific warehouse to which to drive, where a warehouse employee loaded onto the truck six pallets of what Pérez-Meléndez said he believed to be reams of paper, and after which Rivera-Ríos told him to drive on an expressway and stop at a second warehouse, in Caguas. At another point, Pérez-Meléndez stated that, once he and Rivera-Ríos drove onto the expressway between Cataño and Caguas, Pérez-Meléndez began receiving telephone calls from what sounded like a male person whose identity Pérez-Meléndez did not know and whom Pérez-Meléndez did not question but from whom Pérez-Meléndez had received calls

"in the past when he would do similar jobs." Pérez-Meléndez would do "whatever the caller would tell him to do." At still another point, Pérez-Meléndez stated that perhaps it was Rivera-Ríos who was accepting telephone calls from the unidentified person and that the instructions Pérez-Meléndez received were indirectly issued to him from the caller through Rivera-Ríos.

Third, Pérez-Meléndez offered inconsistent statements about the extent to which he knew and had worked with Rivera-Ríos, and about their professional relationship. At one point during the questioning, Pérez-Meléndez stated that he had "done jobs" for Rivera-Ríos in the past. Rivera-Ríos would pay Pérez-Meléndez $100 for those assignments, either before or at the conclusion of the job. By the time of the interview, Pérez-Meléndez reported, he had not yet been paid for the job that day. Later in the interview, Pérez-Meléndez stated that October 11, 2007 was the first time he had worked for Rivera-Ríos. At still another point in the interview, Pérez-Meléndez described Rivera-Ríos not as the former's employer but as his assistant.

### b. Rivera-Ríos Questioning

ATF Task Force Agent Marcos Rodríguez-Mercado ("Rodríguez-Mercado") was among the agents who followed and then arrested Pérez-Meléndez and Rivera-Ríos on October 11, 2007. After Rodríguez-Mercado read Rivera-Ríos his Miranda rights, Rivera-Ríos signed, at 7:00 p.m. in the ATF office, a written waiver of those

rights and submitted himself to questioning. At trial, Rodríguez-Mercado testified to what Rivera-Ríos said during that interview, which Rodríguez-Mercado conducted alone. Rivera-Ríos stated that the owner of the truck, Roberto Morales ("Morales"), was a "friend" of his. Rivera-Ríos also reported that another "friend," whom Rivera-Ríos said he could identify only as "David," called him to make the delivery that day and that Rivera-Ríos had performed a delivery for the same person once before. During that previous delivery, Rivera-Ríos and "David" met in person in Trujillo Alto, transferred some merchandise between vehicles, and Rivera-Ríos was paid $400. Concerning the delivery on the date of the interview, Rivera-Ríos said that "David" instructed him to go to the Amelia Industrial Park, where company employees loaded the merchandise onto the truck. Rivera-Ríos said he did "[w]hatever they tell him."

DEA Special Agent Eduardo Álamo-Ramos ("Álamo-Ramos") was among the DEA agents whom the ATF agents called to Caguas to assist them on October 11, 2007. Álamo-Ramos questioned Rivera-Ríos after Rodríguez-Mercado finished his own interview with the appellant. At trial, Álamo-Ramos testified to what Rivera-Ríos said during that interview. Rivera-Ríos reportedly said that on October 9, 2007, at approximately 10:00 p.m., he received a telephone call from a male person whose name Rivera-Ríos did not know. That male caller asked Rivera-Ríos if he was available to deliver a shipment

to an unspecified location in Caguas. Rivera-Ríos accepted the offer and then called Morales to ask if he could borrow his truck to perform the delivery. Because Rivera-Ríos's truck-driving license had expired, he then contacted Pérez-Meléndez to ask him to drive the truck. Pérez-Meléndez agreed. On October 11, 2007, appellants traveled to Doral, picked up the paper pallets, and drove them to a warehouse near the farmer's market area in Caguas, "where they were to receive final instructions on where the truck was to be delivered." When asked whether Rivera-Ríos had performed any other deliveries for the unidentified male caller, Rivera-Ríos responded that he had, on a single occasion, and related similar details about the location, transfer, and payment as he had to Rodríguez-Mercado, adding that that delivery occurred in either July or August of 2007. At no point during the interview with Álamo-Ramos did Rivera-Ríos produce paperwork for either the July/August 2007 or October 2007 shipments.

### B. Procedural History

#### 1. 2007 Indictment and Relevant Statutes

On October 17, 2007,[2] a grand jury sitting in the U.S. District Court for the District of Puerto Rico charged appellants with one count of "aiding and abetting each other . . . [to]

---

[2] Pérez-Meléndez's appellate brief inaccurately states that the indictment referred to the date on which the charged offense occurred as being "on or about October 17, 2007," when it was actually "[o]n or about October 11, 2007."

knowingly and intentionally possess with intent to distribute five (5) kilograms or more of a mixture or substance containing a detectible amount of cocaine, a Schedule II Narcotic Drug Controlled Substance" in violation of 21 U.S.C. §§ 841(a)(1)[3] and (b)(1)(A)[4] and 18 U.S.C. § 2.[5]

### 2. 2008 Trial and Rule 29 Motion for Acquittal

A jury trial was held from April 28 to 30, 2008.[6] At the close of the government's case, Pérez-Meléndez's attorney moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29 motion").[7] His attorney argued that

---

[3] 21 U.S.C. § 841(a)(1) provides that, "[e]xcept as authorized by this title, it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ."

[4] 21 U.S.C. § 841(b)(1)(A) provides penalties for violations of § 841(a).

[5] 18 U.S.C. § 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

[6] Pérez-Meléndez's appellate brief inaccurately states the year of the trial as "2007."

[7] Rule 29 of the Federal Rules of Criminal Procedure provides, in relevant part:

(a) Before Submission to the Jury.

the government did not satisfy its burden of proving "beyond a reasonable doubt each and every element of the crime charged" because it had "failed to present any evidence that [Pérez-Meléndez] knowingly possessed narcotics." The district judge reserved decision on the motion. After a recess, defense counsel declined to present any evidence and, instead, renewed their Rule 29 motion. The district court again reserved decision on the motion.

### 3. 2008 Jury Instructions and Conviction

The district court instructed the jury that, in order to convict appellants of the charged crime, the government had to

---

After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

(b) Reserving Decision.

The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

Fed. R. Crim. P. 29(a), (b).

prove beyond a reasonable doubt the following three elements: (1) "First, that the Defendants on that date possessed a mixture containing a detectable amount of cocaine, either actually or constructively"; (2) "[s]econd, that they did so with a specific intent to distribute the cocaine over which they had actual or constructive possession;" and (3) "third, that they did so knowingly and intentionally." The court further instructed the jury that, in order to establish aiding and abetting liability, the government had to prove beyond a reasonable doubt the following two elements: (1) "one, someone committed the charged crime (in this case, one of the two defendants)"; and (2) "two, that the other Defendant willfully associated himself in some way with the crime and willfully participated in it as he would in something he wished to bring about." The court explained that

> [t]his means that the Government must prove that one or the other Defendant consciously shared the other Defendant's knowledge of the underlying criminal act and intended to help him. The Defendant need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its execution to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

During a charging conference, defense counsel for Pérez-Meléndez objected to the district court's plan to issue a jury instruction concerning the willful blindness doctrine.

-14-

Nevertheless, later during the trial, the presiding judge issued the following jury instruction, concerning "'Willful Blindness' as a way to satisfy 'Knowingly'":

> In deciding whether Daniel Pérez-Meléndez and Ángel Rivera-Ríos acted knowingly, you may infer that they had knowledge of a fact if you find that they deliberately closed their eyes to a fact that otherwise would have been obvious to them. In order to infer knowledge, you must find that two things have been established. First, that Daniel Pérez-Meléndez and Ángel Rivera-Ríos were aware of a high probability that illegal drugs were packaged within the pallets. Second, that Daniel Pérez-Meléndez and Ángel Rivera-Ríos consciously and deliberately avoided learning of that fact. That is to say, Daniel Pérez-Meléndez and Ángel Rivera-Ríos willfully made themselves blind to that fact. It is entirely up to you to determine whether they deliberately closed their eyes to the fact and, if so, what inference, if any, should be drawn. However, it is important to bear in mind that mere negligence or mistake in failing to learn the fact is not sufficient. There must be a deliberate effort to remain ignorant of the fact.

Counsel for Pérez-Meléndez then reminded the district court judge of her objection to this jury instruction during the charging conference. The judge denied the objection. Because the charging conference had not been on the record, the judge instructed counsel for Pérez-Meléndez to put the objection in writing.

On April 30, 2008, the jury found appellants guilty of the indicted charge.

-15-

**4. 2008 Pérez-Meléndez's Motion and Rivera-Ríos's Joinder**

On May 6, 2008, Pérez-Meléndez filed a motion for a judgment of acquittal and objection to the willful blindness instruction. The same day, Rivera-Ríos filed a motion, which was granted, to join Pérez-Meléndez's motion.

Regarding the motion for a judgment of acquittal, Pérez-Meléndez argued that the government had fallen short of its burden of proving beyond a reasonable doubt each and every element of the crime because it had not provided any evidence of his knowing affirmative or willfully blind participation in the illegal activity or that he had specific knowledge of the presence of narcotics.

Regarding the objection to the willful blindness instruction, Pérez-Meléndez argued that the requirements for giving the instruction were not satisfied. To establish the requirements, Pérez-Meléndez cited our ruling in United States v. Gabriele, which found that

> A willful blindness instruction is warranted if (1) the defendant claims lack of knowledge; (2) the evidence would support an inference that the defendant consciously engaged in a course of deliberate ignorance; and (3) the proposed instruction, as a whole, could not lead the jury to conclude that an inference of knowledge was mandatory.

63 F.3d 61, 66 (1st Cir. 1995). Pérez-Meléndez argued that the instruction was not warranted because the government failed to

satisfy the second requirement, that "the evidence would support an inference that [Pérez-Meléndez] consciously engaged in a course of deliberate ignorance."

### 5.  2008 United States' Motion

On May 22, 2008, the United States filed a motion in opposition.  The United States argued that evidence presented at trial, specifically the testimony of law enforcement agents and appellants' own statements not made at trial, demonstrated appellants' knowledge as to what they were transporting in the truck they were riding in on October 11, 2007.  The United States argued that the jury could have found appellants' knowledge based on either an actual knowledge or willful blindness theory.  The evidence to which the United States pointed was the following: the truck was carrying narcotics, appellants occupied the truck while the cocaine was inside, and it had been proven that appellants had made similar deliveries "four" times before.[8]  The United States concluded that Pérez-Meléndez's motion should be denied because, viewing the evidence in the required light most favorable to the prosecution, each of the elements of the charged offense was proven beyond a reasonable doubt.

---

[8]  The government misstates the amount of times for which evidence was presented that appellants had made similar deliveries before October 11, 2007.  It was three.  See supra, Part I(A)(1).

### 6. 2008 District Court Opinion and Order, Sentencing, and Appeal

On August 8, 2008, the district court denied appellants' motion for judgment of acquittal. Pérez-Meléndez, 571 F. Supp. 2d at 329. The district court determined that "the government provided sufficient evidence, including reasonable inferences, that when considered as a whole, warrant the jury's conclusion that the defendants were guilty beyond a reasonable doubt." Id. at 329. The district court also found the willful blindness instruction to the jury to have been proper. Id. On August 21, 2008, the district court sentenced each of the appellants to 120 months of imprisonment, supervised release for a term of five years, and a monetary penalty of $100.

On August 22, 2008, Pérez-Meléndez filed a timely notice of appeal to this court. Three days later, Rivera-Ríos also filed a timely notice of appeal to this court. Appellants contend that the district court erred in two matters. First, they argue, the district court erred in denying appellants' motion for a judgment of acquittal because there was insufficient evidence to sustain the jury verdict. Second, they claim, the district court erred in issuing a willful blindness instruction to the jury despite appellants' objection because the evidence the government presented at trial did not support an inference that appellants consciously engaged in a course of deliberate ignorance, one of the three

requirements to warrant such an instruction. We begin our discussion below with appellants' first claim.

## II. Discussion

### A. Sufficiency of the Evidence

Appellants argue that the district court committed error in denying the Rule 29 motion Pérez-Meléndez filed and which Rivera-Ríos joined. We agree. As discussed below, we reverse the district court's ruling.

### 1. Standard / Scope of Review

We review the denial of a Rule 29 motion for judgment of acquittal <u>de novo</u>. <u>United States</u> v. <u>Troy</u>, 583 F.3d 20, 24 (1st Cir. 2009). In so doing,

> we examine the evidence, both direct and circumstantial, in the light most favorable to the jury's verdict. We do not assess the credibility of a witness, as that is a role reserved for the jury. Nor need we be convinced that the government succeeded in eliminating every possible theory consistent with the defendant's innocence. Rather, we must decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude <u>beyond a reasonable doubt</u> that the defendant committed the charged crime.

<u>Id.</u> (emphasis added) (internal citations and quotation marks omitted). "If a reasonable jury could have found that the government had proven each element of the crime <u>beyond a reasonable doubt</u>, we will affirm the conviction." <u>United States</u> v. <u>Angulo-Hernández</u>, 565 F.3d 2, 7 (1st Cir. 2009) (emphasis added). "We

-19-

have described this standard of review as 'formidable,' and defendants challenging convictions for insufficiency of evidence face an uphill battle on appeal." United States v. Lipscomb, 539 F.3d 32, 40 (1st Cir. 2008) (internal citation, quotation marks, and brackets omitted). We have repeatedly asserted, however, that, "despite the prosecution-friendly overtones of the standard of review, appellate oversight of sufficiency challenges is not an empty ritual." United States v. De La Cruz Paulino, 61 F.3d 986, 999 n.11 (1st Cir. 1995).

## 2. Legal Framework

We have previously found that,

> [i]n order to establish aiding and abetting liability, the government must prove, first, that the principal committed the substantive offense charged, and second, that the accomplice became associated with the principal's criminal endeavor and took part in it, intending to assure its success. While we have acknowledged that the challenge in aiding and abetting cases is framing the intent element for the jury, we have explicitly declined to require the shared intent language found in some of our opinions and in the First Circuit Pattern Jury Instructions. Instead, we have observed that a showing that the defendant consciously shared the principal's knowledge of the underlying criminal act, and intended to help him is one way for the government to fulfill its burden to show that a defendant participated in the venture and sought by his actions to make it succeed.

United States v. González, 570 F.3d 16, 28-29 (1st Cir. 2009) (emphasis added) (internal citations and quotation marks omitted). "[M]ere association with the principal, or mere presence at the

-20-

scene of a crime, even when combined with knowledge that a crime will be committed, is not sufficient to establish aiding and abetting liability." United States v. Medina-Román, 376 F.3d 1, 4 (1st Cir. 2004). Rather, "proof of sufficient participation in the crime, as well as knowledge of it, is required to convict . . . . [W]here, as here, a defendant actively participates in a venture, but denies any knowledge of the venture's illegal nature, the government must adequately prove knowledge, more so than participation." United States v. Guerrero, 114 F.3d 332, 342 (1st Cir. 1997) (emphasis added).

Willful blindness serves as an alternate theory on which the government may prove knowledge. See, e.g., United States v. Griffin, 524 F.3d 71, 78 (1st Cir. 2008) ("Evidence presented at trial may support either a finding of actual knowledge or a finding of willful blindness."); Guerrero, 114 F.3d at 343 (holding that evidence supports "a finding of positive knowledge, or at least deliberate ignorance"). The willful blindness instruction given in this case permitted the jury to infer knowledge if the jury found that the government has established, beyond a reasonable doubt, that the defendants (1) "were aware of a high probability that illegal drugs were packaged within the pallets," and (2) "consciously and deliberately avoided learning of that fact." App. 10; see United States v. Lizardo, 445 F.3d 73, 86 (1st Cir. 2006) (approving nearly identical instruction). Such an instruction

-21-

"allows the jury to impute knowledge to [a defendant] of what should be obvious to him, if it found, beyond a reasonable doubt, a conscious purpose to avoid enlightenment." United States v. St. Michael's Credit Union, 880 F.2d 579, 585 (1st Cir. 1989) (internal quotation marks and citation omitted).

### 3. Analysis

#### a. The Government's Task

To convict appellants under 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2, the government had to prove beyond a reasonable doubt that appellants knew or were willfully blind to the fact that the pallets of reams of paper they transported contained a controlled substance. The government need not have proved beyond a reasonable doubt, however, that appellants knew or were willfully blind to the fact that the controlled substance was cocaine specifically. See United States v. Dowdell, No. 08-1855, 2010 U.S. App. LEXIS 2859, at *49 (1st Cir. Feb. 12, 2010) (where defendant was prosecuted under 21 U.S.C. § 841(a)(1), "which prohibits distribution of any controlled substance regardless of type, drug identity had no bearing on the substance of the charge") (emphasis in original); United States v. Azubike (Azubike II), 564 F.3d 59, 61, 64, 66 (1st Cir. 2009) (government had to prove beyond a reasonable doubt that a briefcase contained a controlled substance where defendant was charged specifically with possessing heroin); United States v. Azubike (Azubike I), 504 F.3d 30, 31,

-22-

35, 36-38 (1st Cir. 2007) (same). As will be discussed below, the government failed to meet its burden.

### b. The Circumstantial Evidence and the District Court's Inferences Drawn Therefrom

The government relied upon circumstantial evidence to prove appellants' knowing participation or willful blindness in the transportation of a controlled substance. The circumstantial evidence the government presented was: (1) inconsistent statements each appellant made, (2) inconsistent statements between appellants and Cruz-Martínez, and (3) appellants' statements or omissions concerning particular aspects of their delivery on October 11, 2007. Taken as a whole, the government argued, "[t]he evidence at trial showed the defendants knowingly and intentionally possessed, either actually or constructively, a controlled substance with the specific intent to distribute. The evidence supported a finding of either actual knowledge or willful blindness for the crime's intent element." Reply Br. at 12-13.

"In circumstantial cases such as this one, the evidence is sufficient to convict if it adequately supports the requisite two-step inference: (1) that the vessel was engaged in obviously illegal activity and (2) that each defendant was ready to assist in the criminal enterprise." Guerrero, 114 F.3d at 342. As we discuss below, the circumstantial evidence was not sufficient to convict because it did not adequately support the inference that appellants either actually knew about or were willfully blind to

-23-

the controlled substances they were transporting within the pallets of reams of paper.

Appellants contradicted themselves on multiple issues. Pérez-Meléndez, when questioned on October 11, 2007, offered inconsistent statements about three matters: (1) whether he or Rivera-Ríos rented the truck, (2) who provided instructions to him on where to drive and what to do, and (3) the extent to which he knew and had worked with Rivera-Ríos, and about their professional relationship. Rivera-Ríos also contradicted himself when questioned on the same date. When speaking to ATF Task Force Agent Rodríguez-Mercado and DEA Special Agent Álamo-Ramos, Rivera-Ríos alternated between saying that the person who issued instructions to him that day was his friend, "David," and an unidentified male caller. The district court concluded that "[t]he inconsistencies in defendants' recollections of events when speaking to law enforcement raise the inference that they lied to conceal their knowledge of the illegal nature of the activity in which they were involved." Pérez-Meléndez, 571 F. Supp. 2d at 328.

Not only did appellants contradict themselves, but appellants contradicted a third party, in that Pérez-Meléndez contradicted Cruz-Martínez at one point during his questioning on at least one issue. Cruz-Martínez's testimony at trial conflicted with appellants' statements during their questioning on October 11, 2007. Cruz-Martínez testified that appellants made at least three

other pickups for ISD at Doral.  During their questioning, Pérez-Meléndez alternated between stating he worked with Rivera-Ríos multiple times and just once before, and Rivera-Ríos stated that he had only once before performed a delivery for the same male caller, whom he alternately said was unidentified or identified only as "David."  The district court concluded that "[t]his not only shows prior participation by the defendants in criminal endeavors, but it also raises the inference that the defendants prevaricated concerning their prior involvement."  Id.

The district court makes much ado about what it refers to as appellants' "explanation, or more succinctly, their lack of explanation, to law enforcement of certain details concerning the delivery job."  Id.  First, appellants claimed that, when they accepted and initiated the delivery on October 11, 2007, they did not know their precise final destination other than that it was in Caguas.  Appellants claimed to have received more specific instructions once en route.  Second, appellants may not have known who, exactly, hired them.  Pérez-Meléndez said it was either Rivera-Ríos or an unidentified male caller.  Rivera-Ríos said it was either an unidentified male caller or a male caller identified only as "David."  The district court noted that Rivera-Ríos stated he had done another job for the same client, which involved transferring merchandise from one truck to another.  Id.  Third,

appellants did not produce documentation about the October 11, 2007 delivery. The district court thus concluded the following:

> All of these details raise additional questions such as who accepts jobs from an unknown individual to deliver to an unknown location? Another question is why hire a truck and driver to deliver a shipment if the shipment is only to be delivered to another truck rather than a fixed location? These questions beg for answers. The implausible nature of the delivery jobs, as described by defendants to law enforcement, suggests that defendants closed their eyes to the criminal activity in which they were involved. It also allows the inference that defendants knew they were involved in transporting drugs because a legitimate business would not typically act as the defendants did or as their mysterious client did in this case.

Id. (citations omitted).

### c. Our Analysis of the Circumstantial Evidence

Some of the inferences the district court draws are certainly plausible, but their significance is limited. A rational factfinder could have drawn a plausible inference that appellants knew they were involved in an illegal activity because appellants' statements and omissions concerning their job and the manner in which they were hired for and performed that work earlier the same day are suspicious. However, we find that a rational factfinder could not have concluded beyond a reasonable doubt that appellants committed the charged crime because reasonable doubt should have remained that (1) appellants knew that the precise nature of that activity involved controlled substances generally or cocaine

-26-

specifically and (2) appellants were aware of a high probability that illegal drugs were packaged within the pallets and consciously and deliberately avoided learning of that fact.

As we have previously observed, "knowledge that one is guilty of some crime is not the same as knowledge that one is guilty of the crime charged." Nieves-Castaño, 480 F.3d at 601 (emphasis in original). A significant body of case law from other circuits exists in which insufficiency of evidence was found where a defendant may have known he was participating in an illegal activity but there was little or no evidence to suggest that the defendant knew that the activity involved drugs specifically, and we adopt that position here. See, e.g., United States v. Cruz, 363 F.3d 187, 189, 198 (2d Cir. 2004) ("[T]he government failed to introduce sufficient evidence such that a reasonable trier of fact could find [defendant] guilty beyond a reasonable doubt" of aiding and abetting a drug-related crime because "[p]roof that the defendant knew that some crime would be committed is not enough.") (emphasis in original); United States v. Cartwright, 359 F.3d 281, 283, 286 (3d Cir. 2004) ("[T]he evidence adduced at trial did not support an inference that [defendant] knew he was participating in a transaction that involved a controlled substance, as opposed to some other form of contraband . . . . Although [the] evidence may be sufficient to prove that [defendant] knew he was participating in some sort of illegal transaction, these facts nonetheless are

-27-

insufficient to prove beyond a reasonable doubt that [defendant] knew the transaction involved drugs."); United States v. Fitz, 317 F.3d 878, 883 (8th Cir. 2003) (reversing jury verdict on the basis of insufficient evidence where the defendant may have been aware a transaction was illegitimate but there was no evidence that he was a knowing participant in the drug conspiracy.); United States v. Idowu, 157 F.3d 265, 266 (3d Cir. 1998) ("[E]ven in situations where the defendant knew that he was engaged in illicit activity, and knew that some form of contraband was involved in the scheme in which he was participating, the government is obliged to prove beyond a reasonable doubt that the defendant had knowledge of the particular illegal objective contemplated by the conspiracy.") (internal quotation marks omitted); United States v. Thomas, 114 F.3d 403, 405-06 (3d Cir. 1997) (reversing jury verdict on the basis of insufficient evidence where the defendant "knew that he was somehow involved in an illicit activity" but there was no evidence that he "knew that drugs were involved."); United States v. Wexler, 838 F.2d 88, 91 (3d Cir. 1988) (reversing jury verdict on the basis of insufficient evidence, despite "ample circumstantial evidence . . . from which the jury could have concluded that [the defendant] was involved in a conspiracy with co-defendants . . . and that the conspiracy involved movement of the cargo of the truck . . . [but] missing is any evidence that

-28-

[the defendant] knew that a controlled substance was . . . [in the] truck.").

While over-emphasizing the factors mentioned above, the district court under-emphasized other factors in assessing whether the evidence was sufficient to permit a jury to conclude, beyond a reasonable doubt, that appellants knew or were willfully blind to the fact that the pallets of reams of paper they transported contained a controlled substance. Specifically, the district court downplays the significance of the cocaine's packaging and the fee appellants received for transporting the pallets, stating: "The fact that the drugs were artfully concealed within reams of paper and that the plaintiffs told law enforcement that they were not paid an unusually excessive amount in the past (between $100 and $400) are not outcome determinative." Pérez-Meléndez, 571 F. Supp. 2d at 329. While we agree these factors are not "outcome determinative," we also find that, partly because of them, a rational factfinder should have retained reasonable doubt that appellants knew or were willfully blind to the fact that the pallets contained a controlled substance. The cocaine was concealed so well in packaging Doral left unwrapped that a team of law enforcement agents could not detect it themselves and needed a trained canine to do so. Although "[w]e have eschewed . . . a myopic inquiry into whether one particular indication of knowledge (such as a smell) did, or did not, exist[,] . . . we turn to other

-29-

factors to determine whether or not the government sufficiently established the [defendants'] knowledge of the presence of a controlled substance."  Guerrero, 114 F.3d at 342 (citations and internal quotations omitted).  One such factor is "the absence of a legitimate purpose for the voyage."  Id.  Here, however, a legitimate purpose for the voyage was present, in that appellants were transporting what appeared to be pallets of reams of paper to what appeared to be a paper company.  See United States v. Mehtala, 578 F.2d 6, 10 (1st Cir. 1978) (finding no criminal participation given that "the small packages of drugs were easily hidden" and the absence of evidence indicating that the defendant "embarked on the voyage for any purpose other than a pleasure cruise").  Moreover, the $100 fee that Pérez-Meléndez said he received for similar jobs as the one on October 11, 2007 was in the same range as what Doral would pay independent contractors it would hire for such deliveries.  The $400 fee that Rivera-Ríos said he received for a similar job was four times what Doral would pay independent contractors, but not necessarily excessive.

There were other factors the district court did not identify that should have further left a rational factfinder with reasonable doubt that appellants knew or were willfully blind to the fact that the pallets contained a controlled substance. Doral, an authorized company in Puerto Rico engaged in the lawful business of transporting shipments from, among other places, the Dominican

Republic and which was not charged with any wrongdoing in this case, provided appellants with documentation indicating (1) that the Customs and Treasury departments had provided clearances on the shipment and (2) what that shipment (supposedly) contained. The truck appellants drove was a common vehicle unequipped with weaponry or sophisticated technology. Cf. Guerrero, 114 F.3d at 337 (where, despite no presence of weapons, presence of sophisticated navigational equipment suggested transportation of contraband). Appellants drove the vehicle during the daytime through an industrial zone, where such commercial traffic was common, having picked up its shipment from a shipping company no party claims was illegitimate. There was no evidence in the record indicating that appellants owned, previously possessed or controlled, or were otherwise involved in packing the pallets of reams of paper. The confidential source did not reportedly identify either appellant when the source called ATF agents and provided the agents with other details about a planned robbery. To be clear, it is not the presence of these factors alone that should leave a rational factfinder with reasonable doubt. Instead, it is the presence of these factors, together with the absence of any evidence supporting a finding of knowledge or willful blindness to the transportation of controlled substances, that supports our conclusion that no rational jury could find knowledge or willful blindness beyond a reasonable doubt.

Although the government is allowed to prove by circumstantial evidence that appellants knew or were willfully blind to the fact that the pallets in question contained drugs, here it only succeeded in establishing, at most, that appellants knew or were willfully blind to the fact that something illegal was afoot.[9] Any conclusion by the jury beyond that, specifically imputing to appellants knowledge of or willful blindness to the contents of the pallets, was the product of pure speculation. This is particularly true when one considers that the burden is proof beyond a reasonable doubt. See Idowu, 157 F.3d at 270 (holding that there was insufficient evidence that the object of the transaction was drugs and that "no reasonable jury could have concluded that the government had met its burden of proof, which requires proof beyond a reasonable doubt"); United States v. Olivo-Infante, 938 F.2d 1406, 1409 (1st Cir. 1991).

The evidence the government presented in this case would have been just as consistent with that of a case involving the smuggling of contraband other than a controlled substance. This contraband could plausibly have been other goods, such as weapons, stolen jewels or computer chips, counterfeit currency, diamonds and

---

[9] Judge Torruella wishes to note that he disagrees with the other members of the panel on the issue of whether the jury could have found, beyond a reasonable doubt, that appellants knew about or were willfully blind to any illegality. In Judge Torruella's opinion, the evidence does not establish, beyond a reasonable doubt, that appellants knew about or were willfully blind to such criminal activity.

other precious minerals from Africa, cigars from Cuba, fuel, or child pornography. See, e.g., United States v. José, 499 F.3d 105, 106-07 (1st Cir. 2007) (concerning defendant charged with attempting to smuggle cash while departing from Luis Muñoz Marín International Airport in Puerto Rico); Rivera-Jiménez v. Pierluisi, 362 F.3d 87, 91 (1st Cir. 2004) (concerning plaintiff law enforcement agent assigned to investigate weapons smuggling in Puerto Rico); United States v. Maravilla, 907 F.2d 216, 222 (1st Cir. 1990) (concerning defendant who was reportedly involved in smuggling gold statues through an airport in Puerto Rico); United States v. Lespier, 601 F.2d 22, 24 (1st Cir. 1979) (concerning defendant charged with smuggling cases of liquor aboard a boat off of Puerto Rico). Here the government presented no evidence at trial that could have led a reasonable jury to find beyond a reasonable doubt that (1) appellants knew whatever contraband may have been present involved a controlled substance or (2) appellants were aware of a high probability that illegal drugs were packaged within the pallets and consciously and deliberately avoided learning of that fact.

This case can be distinguished from other recent cases in which we have found that the evidence was sufficient to uphold a jury's verdict where defendants were charged with similar crimes. For example, in Azubike I and Azubike II, we ruled that there was sufficient evidence to convict the defendant for conspiring to

distribute heroin and possessing heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 846, on the basis that he knew a briefcase he picked up from another individual contained drugs. 564 F.3d at 69; 504 F.3d at 42. In that case, which we acknowledged was "close," Azubike I, 504 F.3d at 36, we relied on the following facts, among others, to draw inferences that supported the jury's verdict. First, a recording of a telephone conversation between the defendant and the other individual indicated that the defendant emphatically resisted discussing the nature of the "stuff" on the telephone, suggesting that the defendant knew the contents of the briefcase and that they should not be discussed over the telephone. Azubike I, 504 F.3d at 37; Azubike II, 564 F.3d at 64. Second, based in part on a log of 178 telephone calls among them within a one-and-a-half-month period, the defendant apparently was closely associated with two individuals who had a direct relationship with the source of the drugs, further suggesting that the defendant knew the contents of the briefcase. Azubike II, 564 F.3d at 63-64. Here, however, we have no such similar circumstances. There is no evidence that appellants themselves resisted or otherwise tried to conceal the true nature of the shipment. While Cruz-Martínez testified that appellants worked together at least four times in 2007, and Pérez-Meléndez at one point stated he had known Rivera-Ríos for three years, neither of the appellants appears to have had a close

-34-

relationship with their overall employer, who was either unknown to appellants or was known to Rivera-Ríos as someone named "David," for whom Rivera-Ríos said he had worked only once before, a claim about which there is no contradictory evidence in the record.

We thus find that there is insufficient evidence that appellants knew or were willfully blind to the fact that controlled substances were hidden in the pallets of reams of paper. We thus find that the evidence was not sufficient to convict appellants because it did not adequately support the requisite two-step inference that (1) the truck Pérez-Meléndez was driving and in which Rivera-Ríos was a passenger was engaged in the obvious transportation of a controlled substance or (2) that each appellant was ready to assist in that criminal enterprise. The evidence would not allow a rational factfinder to conclude beyond a reasonable doubt that appellants committed the charged crime. Thus, because the government failed to prove an essential element of the crime charged against appellants by proof beyond a reasonable doubt -- that appellants <u>knowingly</u> possessed cocaine -- the Constitution mandates acquittal on the charge against both appellants. <u>See</u> <u>In re Winship</u>, 397 U.S. 358, 364 (1970) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

**B. Willful Blindness Jury Instruction**

Having found the evidence insufficient to sustain the jury verdict against appellants, we need not deal with appellants' argument concerning the adequacy of the willful blindness jury instruction. See United States v. Carucci, 364 F.3d 339, 340, 347 n.8 (1st Cir. 2004) (finding that the court need not address a defendant's challenge to the trial court's willful blindness instruction to the jury where the court held that the evidence against the defendant was insufficient to establish criminal liability under the relevant statute).

**III. Conclusion**

In light of the specific facts in this case, we conclude that there was insufficient evidence of appellants' criminal scienter that they were transporting five kilograms or more of cocaine specifically or a controlled substance generally. We therefore hold that no reasonable jury could have concluded that the government had met its burden of proof, which requires proof beyond a reasonable doubt. Accordingly, the judgment of the district court will be reversed. Appellants' convictions and sentences are vacated and the case is remanded for proceedings consistent with this opinion.

**Reversed, Vacated and Remanded**.