# United States Court of Appeals
## For the First Circuit

No. 10-1393

UNITED STATES,

Appellee,

v.

ALBERT I. DÍAZ, a/k/a Gringo,

Defendant, Appellant.

No. 10-1412

UNITED STATES,

Appellee,

v.

JAVIER RODRÍGUEZ-ROMERO, a/k/a Panky,

Defendant, Appellant.

No. 10-1530

UNITED STATES,

Appellee,

v.

EDDIE M. RODRÍGUEZ, a/k/a Bolón,

Defendant, Appellant.

No. 10-1686

UNITED STATES,

Appellee,

v.

ANGEL O. LÓPEZ-CAPÓ, a/k/a Baby Face,

Defendant, Appellant.

———————

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

———————

Before

Lynch, Chief Judge,
Stahl and Thompson, Circuit Judges.

———————

Jorge E. Rivera-Ortíz, by Appointment of the Court, for Albert I. Díaz.

Sonia I. Torres-Pabón, by Appointment of the Court, for Javier Rodríguez-Romero.

Michael R. Hasse, by Appointment of the Court, for Eddie M. Rodríguez.

John E. Mudd, by Appointment of the Court, for Angel O. López-Capó.

Rosa Emilia Rodríguez-Vélez, United States Attorney, with whom Nelson Pérez-Sosa, Assistant United States Attorney, and Luke Cass, Assistant United States Attorney, were on brief for appellee.

———————

January 20, 2012

———————

**STAHL**, <u>Circuit Judge</u>.    A jury convicted defendants-appellants Albert I. Díaz, Javier Rodríguez-Romero, Eddie M. Rodríguez, and Angel O. López-Capó of conspiracy to distribute narcotics and possession with intent to distribute narcotics as a result of their participation in a drug point that operated within a public housing project in Guayama, Puerto Rico.  The defendants individually raise a variety of challenges to the district court's jurisdiction, the sufficiency of the evidence, the court's evidentiary rulings, the jury instructions, and their sentences. After careful consideration, we find merit to only one of these claims.  Specifically, we find that the district court lacked jurisdiction over Rodríguez, who was a juvenile during much of the conspiracy, with respect to two of the substantive drug counts of which he was convicted.  We thus vacate those convictions and remand his case to the district court for a new sentencing hearing. We affirm in all other respects.

## I. Facts & Background

On March 27, 2009, a grand jury returned a seven-count indictment against the defendants and forty-three other individuals.  The indictment alleged, among other things, that the defendants conspired to operate a drug point in the San Antonio Public Housing Project (commonly known as "Carioca"), in the municipality of Guayama, Puerto Rico.

Count One of the indictment alleged that, between 2006 and March 27, 2009, the defendants and others knowingly conspired to possess with intent to distribute various amounts of cocaine base ("crack"), heroin, cocaine, marijuana, and Oxycodone within 1,000 feet of a school and/or public housing facility and/or playground, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 860. We refer to this as the "conspiracy count."

Counts Two through Five of the indictment alleged that, between 2006 and March 27, 2009, the defendants and others, aiding and abetting each other, knowingly and intentionally possessed with intent to distribute one kilogram or more of heroin (Count Two), fifty grams or more of crack (Count Three), five kilograms or more of cocaine (Count Four), and 1,000 kilograms or more of marijuana (Count Five) within 1,000 feet of a school and/or public housing facility, in violation of 21 U.S.C. §§ 841(a)(1) and 860 and 18 U.S.C. § 2. We refer to these as the "substantive drug counts."

Count Six alleged that, between 2006 to March 27, 2009, López-Capó, Díaz, and others conspired to carry and use firearms during and in relation to the drug trafficking crimes charged in Count One, in violation of 18 U.S.C. § 924(o). Count Seven, which is not at issue here, sought the forfeiture of drug proceeds.

According to the indictment, Díaz worked primarily as an "enforcer" for the drug point, meaning that he used firearms to

-4-

protect the drug point's employees, narcotics, and proceeds. Rodríguez and Rodríguez-Romero allegedly worked as runners and sellers, meaning that they supplied the drug point with narcotics, collected proceeds, recruited and paid sellers, and prepared ledgers, also known as "tallies," to keep track of the drug point's sales. The indictment alleged that López-Capó was one of the owners of the drugs distributed at Carioca and that he received proceeds from the sale of crack at the drug point.

These four defendants elected to go to trial. The government presented the testimony of three co-operating witnesses, who had themselves participated in the Carioca drug point: Heriberto García-Román, Leonardo Martínez de León, and Yamil Irizarry-Lucas. The government also presented the testimony of various officers from the Puerto Rico Police Department who had conducted surveillance and arrests, or otherwise intervened, at Carioca. Finally, the government presented the testimony of Carmen Orengo, a licensed chemist for the Puerto Rico Forensic Sciences Institute, who analyzed some of the controlled substances seized from Carioca. Based on her analysis of the substances and the co-operating witnesses' testimony regarding the frequency of sales at the drug point, Ms. Orengo estimated that, in a given year, the Carioca drug point had sold 21.9 kilograms of crack, 5.47 kilograms of heroin, 10.95 kilograms of cocaine, and 18.25 kilograms of marijuana.

The jury found Díaz guilty of Counts One through Five but acquitted him of Count Six.  Rodríguez-Romero and Rodríguez were found guilty of Counts One through Five.  López-Capó, who testified at trial, was found guilty of Counts One and Three and acquitted of all other counts.  This timely appeal followed.[1]

## II. Discussion

### A.  The "Schoolyard" Counts

We begin with a claim raised by Díaz and López-Capó that the government failed to prove beyond a reasonable doubt that the relevant drug activity took place within 1,000 feet of a protected area.  See 21 U.S.C. § 860(a).  They also argue that the evidence was insufficient to establish the existence of a school, playground, or public housing project as those locations are defined in the statute.  See id.  Because Díaz and López-Capó raised this argument as part of a Rule 29 motion, we review de novo, viewing the evidence and drawing all reasonable inferences in

---

[1] We note the possibility that Díaz, Rodríguez-Romero, and López-Capó may be eligible to petition for resentencing under the new sentencing guidelines promulgated pursuant to the Fair Sentencing Act of 2010.  See 18 U.S.C. § 3582(c)(2); U.S.S.G. §§ 1B1.10, 2D1.1.  Those guidelines were made retroactive effective November 1, 2011.  See News Release, U.S. Sentencing Comm'n, U.S. Sentencing Comm'n Votes Unanimously to Apply Fair Sentencing Act of 2010 Amendment to the Fed. Sentencing Guidelines Retroactively (June 30, 2011) (available at http://www.ussc.gov/Legislative_and_ Public_Affairs/Newsroom/Press_Releases/20110630_Press_Release.pdf); U.S. Sentencing Comm'n Notice of Final Action Regarding Amendment to Policy Statement 1B1.10, 76 Fed. Reg. 41332 (July 13, 2011).  Because the defendants have not raised this argument on appeal, we do not address it here, nor do we express any opinion about the merits of any such future petition.

the light most favorable to the verdict.  United States v. Pérez-Meléndez, 599 F.3d 31, 40 (1st Cir. 2010).  We conclude that the 1,000-foot requirement was met and that the evidence was sufficient to establish the existence of a public housing project.  We therefore need not address whether the government also proved that the defendants engaged in drug-related activity within 1,000 feet of a school or playground.

Title 21 U.S.C. § 860(a), also known as the "schoolyard statute," provides enhanced penalties for the distribution, possession with intent to distribute, or manufacturing of drugs "in or on, or within one thousand feet of" any of three protected areas: (1) a school; (2) a playground; or (3) a public housing facility.  The indictment charged the defendants with conspiring to possess with intent to distribute various controlled substances "within one thousand (1,000) feet of" all three protected areas.[2]

The government seems to have made its job unnecessarily difficult by alleging that the drug activity occurred "within 1,000 feet of" a protected area, rather than simply alleging that it occurred "in or on" a protected area, as the statute allows.  See 21 U.S.C. § 860(a).  When the government charges a defendant under

---

[2] The conspiracy count charged that the drug conspiracy took place within 1,000 feet of a school and/or public housing facility and/or playground.  The substantive drug counts only charged that the possession with intent to distribute took place within 1,000 feet of a school and/or public housing facility, omitting any mention of the playground.

the "within 1,000 feet" prong of the statute, we have held that the government must prove beyond a reasonable doubt that the distance from the protected area to the site of the drug transaction is 1,000 feet or less. United States v. Soler, 275 F.3d 146, 154 (1st Cir. 2002). Because "[d]istances are notoriously difficult to gauge in still photographs, and more so in motion pictures," we have generally insisted that the government provide a precise measurement. Id. at 155 (internal citation omitted). We have, however, carved out an exception "in some cases where the spatial leeway is relatively great and the gap in the chain of proof is relatively small," such that "common sense, common knowledge, and rough indices of distance can carry the day." Id. at 154.

The government offered ample evidence that the drug point operated within the Carioca housing project. Government witness Heriberto García-Román testified that the drug point was located "[i]nside of the Carioca Public Housing Project. . . . in some abandoned houses that were located right there inside of the Public Housing Project." Police Officer Víctor J. Veguilla-Figuero testified that the drug point was located "in the area of the staircase," in "two abandoned houses" and "in the children's play area" within the Carioca housing project, and he identified each of those locations in a photograph of Carioca. Leonardo Martínez de León, who himself dealt drugs in Carioca, identified various locations from which the drug point operated within Carioca. And

Police Officer Roberto Ayala-Vega testified that "the drug point was always within Carioca" but moved among multiple buildings in the housing project.

The evidence was also sufficient to establish that Carioca is a "housing facility owned by a public housing authority," as required by 21 U.S.C. § 860(a). Officer José Ortiz-Sierra, of the Puerto Rico Police Department's Monitoring Center for the Public Housing Projects, testified that the Monitoring Center has surveillance cameras within Carioca. It would be reasonable for the jury to infer from this testimony that Carioca is a public housing project. See Pérez-Meléndez, 599 F.3d at 40. Furthermore, defense witness Jessica Pinto-Capó, who worked as a secretary in the Housing Department, testified that she "grew up in the Carioca Public Housing Project" and that all Carioca apartments are owned by the Public Housing Authority.

Given that the evidence was sufficient for the jury to find that the drug point operated within Carioca and that Carioca is a public housing facility, it was also sufficient to establish that the drug point operated within 1,000 feet of a public housing facility. Where the government alleges that drug-related activity occurred "within 1,000 feet" of a protected area under 21 U.S.C. § 860(a) and then proves that the activity actually occurred "in or on" the protected area, the government need not provide a precise

measurement establishing the 1,000-foot requirement.[3]  In such an instance, common sense will carry the day.  Soler, 275 F.3d at 154.

We thus affirm Díaz's conviction.  We address López-Capó's other claims below.

## B.  Rodríguez

Rodríguez (a.k.a. "Bolón"), who was convicted of the conspiracy count as well as four substantive drug counts, was either a juvenile or incarcerated in a juvenile detention facility for much of the time that the Carioca drug point operated. Rodríguez argues that the evidence offered at trial was insufficient to establish that he participated in the conspiracy or committed any of the substantive drug counts after he turned eighteen and that the district court thus lacked jurisdiction under the Federal Juvenile Delinquency Act (FJDA).  See 18 U.S.C. § 5032. We review the sufficiency of the evidence de novo to determine whether the court's exercise of jurisdiction was proper.  See United States v. Vargas-De Jesús, 618 F.3d 59, 63 (1st Cir. 2010). Rodríguez also argues that the court failed to properly instruct the jury with respect to the FJDA.  We review preserved objections to a district court's jury instructions de novo, but we review for plain error where the defendant did not properly object before the

_____

[3] Nonetheless, the better practice here would have been for the government to either allege in the indictment that the drug point operated "in or on" the public housing project, or to provide a precise measurement demonstrating that the 1,000-foot requirement was met.

-10-

district court.  See, e.g., United States v. Meadows, 571 F.3d 131, 145 (1st Cir. 2009).

Absent a certification from the Attorney General, the FJDA prevents a district court from exercising jurisdiction over a defendant who is under the age of twenty-one for criminal acts that he committed before he turned eighteen.  See 18 U.S.C. § 5032; Vargas-De Jesús, 618 F.3d at 64.  In this case, it is undisputed that the government failed to present the district court with a certification from the Attorney General and that the proceedings began before Rodríguez turned twenty-one.  We have held that "a conviction must be set aside, even absent timely objection, if the record establishes that a defendant was under the age of 18 when the offense was committed and under the age of 21 when criminal proceedings were commenced."  Vargas-De Jesús, 618 F.3d at 64. There are, however, some important limitations on that rule. First, the jurisdictional question is one that the jury can decide; there is no need for a pretrial evidentiary hearing.  United States v. Welch, 15 F.3d 1202, 1210 (1st Cir. 1993).  Second, a "jury may properly hear evidence regarding a defendant's premajority conduct to establish the existence of a conspiracy."  Vargas-De Jesús, 618 F.3d at 65.  However, if the conspiracy began before the defendant turned eighteen, there can be no conviction unless the jury finds that the defendant "in some manner 'ratified' [his] participation

in the conspiracy after attaining majority."  Welch, 15 F.3d at 1212; see also Vargas-De Jesús, 618 F.3d at 65.

According to the indictment, this conspiracy lasted from 2006 to March 27, 2009.  Rodríguez was apparently active in the drug point until he entered a juvenile detention facility on or about May 4, 2007.  He turned eighteen in February of 2008,[4] while in detention, and was released on August 18, 2008.  Thus, if Rodríguez participated in the conspiracy as an adult, it had to have been between August 18, 2008 and March 27, 2009.

The district court instructed the jury that it could not consider Rodríguez's acts in furtherance of the conspiracy before he turned eighteen unless it first found beyond a reasonable doubt that he had participated in the conspiracy after he turned eighteen.  The jury convicted Rodríguez of five counts: the conspiracy count (Count One) and four substantive counts of possession with intent to distribute heroin (Count Two), crack (Count Three), cocaine (Count Four), and marijuana (Count Five). The district court used an offense level of 36[5] and a Criminal History Category (CHC) of I, which yielded a sentencing guideline

---

[4] On at least one page of his brief, Rodríguez lists his birthday as February 18, 1990, though he lists it as February 19, 1990 elsewhere.  The pre-sentence investigation report and the trial testimony of Rodríguez's wife established that Rodríguez was born on February 19, 1990.

[5] The court used a base offense level of 34 and applied a two-point enhancement because the relevant drug activity occurred within 1,000 feet of a protected area.  See U.S.S.G. § 2D1.2(a)(1).

range of 188 to 235 months. As to each count, the court sentenced Rodríguez to 188 months (fifteen years and eight months) in prison and ten years of supervised release, all to be served concurrently.

Our cases have separated the jurisdictional analysis with respect to a conspiracy count from the jurisdictional analysis with respect to a substantive drug count. We have distinguished the "continuing offense" of conspiracy from a "non-continuing substantive violation," finding that it will generally be "readily apparent" whether a substantive violation occurred before or after the defendant's eighteenth birthday. Welch, 15 F.3d at 1207. In Vargas-De Jesús, the government had failed to provide the necessary certification under the FJDA, and the defendant was found guilty of one conspiracy count and two substantive drug counts. 618 F.3d at 63. We concluded that the district court had jurisdiction over the conspiracy count, because there was ample evidence that the defendant had continued participating in the conspiracy after he turned eighteen. Id. at 65-66. However, we vacated the defendant's convictions on the substantive drug counts, finding that the evidence the government had offered in support of those counts related solely to acts the defendant had committed before he turned eighteen and that the court thus lacked jurisdiction. Id. at 64-65. With those principles in mind, we turn to the case at hand.

### 1. The conspiracy count

Rodríguez's first claim is that there was insufficient evidence of his participation in the conspiracy post-majority for the district court to exercise jurisdiction over that count. We find the evidence sufficient. Government witness Leonardo Martínez de León testified that Rodríguez acted as a runner for the drug point "towards the end of 2008" and in 2009, that runners "would give the material to the . . . pushers," and that Rodríguez was the person who handled marijuana for the drug point in 2008 and 2009. Martínez de León also testified that he paid Rodríguez $40.00 per week to be able to sell his own marijuana in Carioca at the "[e]nd of 2008, beginning [of] 2009." Given that Rodríguez turned eighteen in February 2008, the evidence was sufficient for a reasonable jury to find that Rodríguez ratified his participation in the conspiracy post-majority. See Vargas-De Jesús, 618 F.3d at 65-66.

Rodríguez also raises a properly-preserved challenge to the court's jury instruction regarding the conspiracy count, which we review de novo. See, e.g., Meadows, 571 F.3d at 145. The district court gave the jury an instruction and included a special question on the verdict form regarding Rodríguez's participation in the conspiracy before and after he turned eighteen. The instruction went as follows:

> Let me say something about Eddie Rodriguez, also known as Bolon's age. The case of Eddie

-14-

> Rodríguez requires that a jury make a threshold consideration. You cannot consider his acts in furtherance of the conspiracy before he turned 18 years of age, unless you first find beyond a reasonable doubt that he participated in the conspiracy after he reached the age of 18 years. If he participated in the conspiracy after he became 18 years of age, then all of his acts in furtherance of the conspiracy while he was a minor can be considered as if he was of legal age.

The special question on the verdict form asked whether the jury found that Rodríguez had participated in the conspiracy after he turned eighteen; the jury answered in the affirmative.

The last sentence of the instruction was not entirely precise as a matter of law. While "the jury may properly hear evidence regarding a defendant's premajority conduct to establish the existence of a conspiracy," Vargas-De Jesús, 618 F.3d at 65, we have never held that the jury can consider all of a defendant's acts in furtherance of the conspiracy as if he was an adult when he committed them, see id. at 63-67; Welch, 15 F.3d at 1206-10. However, Rodríguez has given us no reason to believe that this error prejudiced him. See United States v. Duclos, 214 F.3d 27, 34 (1st Cir. 2000) ("An error in jury instructions will mandate reversal only when the error is prejudicial based on a review of the entire record."). The jury specifically found on its verdict form that Rodríguez had participated in the conspiracy after he turned eighteen, and there was ample evidence of post-majority

ratification for the court to exercise jurisdiction. We thus affirm Rodríguez's conviction on the conspiracy count.

## 2. The substantive drug counts

Rodríguez also challenges the district court's exercise of jurisdiction over the substantive drug counts, arguing that the evidence was insufficient to support jurisdiction and that the district court failed to properly instruct the jury regarding those counts.

We begin with the substantive count of possession with intent to distribute marijuana. Martínez de León's testimony was sufficient to establish jurisdiction over Rodríguez with respect to that count. Martínez de León testified that Rodríguez was the person who handled marijuana for the drug point in 2008 and 2009, that Rodríguez was one of two "owners of the weed" at the drug point, and that Martínez de León therefore paid Rodríguez to be able to sell his own marijuana in Carioca at the end of 2008 and in 2009. We find that the jury reasonably could have credited Martínez de León's testimony and found sufficient evidence of post-majority activity for the district court to exercise jurisdiction over the marijuana count. See Vargas-De Jesús, 618 F.3d at 64-65.

For the substantive heroin, crack, and cocaine counts, the jurisdictional question is more complex. Here, the government points to Martínez de León's testimony that: (1) Rodríguez was a runner in late 2008 and 2009; (2) he knew Rodríguez was a runner

-16-

because "[Rodríguez] would handle the marijuana"; and (3) he paid Rodríguez to be able to sell marijuana in Carioca. The government's brief suggests that "Martínez de León said that runners provided him with drugs to sell, including cocaine, crack, heroin, and marijuana," but we find no such statement in his testimony. In the cited portion of his testimony, Martínez de León actually said, "well, the runners would give the material to the . . . pushers," without specifying (or being asked by the government) what "material" he was referring to. The government then asked Martínez de León how he knew that Rodríguez was a runner for the drug point in 2008 and 2009, and Martínez de León responded, "because he would handle the marijuana." Though Martínez de León did testify that he "was able to put drugs in the housing project" by paying $40.00 per week in "rent" to Rodríguez and another individual, when the prosecutor asked him what he meant by having to pay "rent," Martínez de León testified as follows:

> A. Well, to pay rent -- to put it in this way, Bolon and Axel were the owners of the weed, so from there they were charging me 40 each one. 40, 40.
>
> Q. And they would charge you 40 each one for what?
>
> A. For the marijuana.
>
> Q. And you would pay them the 40 bucks, and what would you get in exchange for paying them the 40 bucks?
>
> A. I could continue selling the material through the Carioca [sic].

-17-

Thus, taken in context, the reasonable inference to be drawn from this testimony is that "the material" refers to marijuana. The evidence does not establish that Martínez de León paid Rodríguez to be able to sell anything other than marijuana, that all runners handled all four drugs (heroin, crack, cocaine, and marijuana), or that Rodríguez personally possessed or distributed any drug other than marijuana after he turned eighteen.

Recognizing that the evidence is lacking, the government offers two theories to support jurisdiction over Rodríguez with respect to the substantive heroin, crack, and cocaine counts. The first is that, because each of the counts included an aiding and abetting charge, the jury could have convicted Rodríguez of aiding and abetting in the possession or distribution of crack, heroin, and cocaine. We reject that argument, because the government has pointed us to no evidence in the record demonstrating that Rodríguez aided or abetted in the possession or distribution of those drugs after he turned eighteen.

The government's second argument is that the jury received an instruction regarding, and may have convicted Rodríguez under, the Pinkerton theory of liability, pursuant to which a defendant can be held liable for the substantive offenses of his co-conspirators if those offenses were reasonably foreseeable and committed in furtherance of the conspiracy. See Pinkerton v. United States, 328 U.S. 640 (1946); United States v. Vázquez-Botet,

532 F.3d 37, 62 (1st Cir. 2008). The government's theory seems to be that, once a juvenile defendant ratifies his participation in a conspiracy post-majority, he can be held liable for all reasonably-foreseeable offenses committed in furtherance of that conspiracy, including offenses that occurred before he turned eighteen (which, in Rodríguez's case, is when he appears to have been most active in the drug point).

The propriety of exercising jurisdiction over a juvenile under the Pinkerton doctrine was not before us in Vargas-De Jesús. In that case, the government entirely failed to address the defendant's substantive drug convictions in its brief, defending them for the first time at oral argument on the grounds that there was sufficient post-majority evidence to convict. Vargas-De Jesús, 618 F.3d at 64. We thus have not yet examined whether a district court has jurisdiction over a defendant under the FJDA with respect to substantive offenses committed by the defendant's co-conspirators before the defendant turned eighteen. We find that it does not.

The FJDA strips a district court of jurisdiction "if the record establishes that a defendant was under the age of 18 when the offense was committed and under the age of 21 when criminal proceedings were commenced." Id. (emphasis added); see also 18 U.S.C. § 5032. Though the "continuing offense" of conspiracy may span a defendant's eighteenth birthday, a "non-continuing

-19-

substantive violation" generally will not. <u>Welch</u>, 15 F.3d at 1207. We will allow evidence of <u>acts comprising an offense</u> to be admitted even if those acts occurred before the defendant turned eighteen, but the government cannot rely entirely on pre-majority acts to establish jurisdiction over an offense. See <u>id.</u> at 1207 n.5. There must be sufficient proof of post-majority activity. <u>See, e.g.</u>, <u>Vargas-De Jesús</u>, 618 F.3d at 65. Thus, when a defendant has participated in a conspiracy both before and after his eighteenth birthday and the government fails to obtain a certification from the Attorney General under 18 U.S.C. § 5032, the defendant cannot be held liable for the substantive crimes of his co-conspirators unless there is sufficient evidence for a reasonable jury to find that each substantive crime occurred after the defendant turned eighteen, was reasonably foreseeable to the defendant, and was committed in furtherance of the conspiracy. See <u>id.</u>; <u>Pinkerton</u>, 328 U.S. 640. The district court must, in turn, properly instruct the jury regarding the government's burden and the jury's inability to consider the substantive crimes of co-conspirators committed before the defendant's eighteenth birthday in assessing the defendant's liability.

As mentioned above, the jury here received a <u>Pinkerton</u> instruction, which Rodríguez does not challenge on appeal. Though we find this to be a very close case, the evidence on the record ultimately supports Rodríguez's conviction on the substantive crack

count under a Pinkerton theory of liability. Specifically, the government introduced evidence that the police seized 150 vials of crack from Rodríguez-Romero, a co-conspirator, on October 24, 2008, which was after Rodríguez ratified his participation in the conspiracy post-majority. We will assume that the jury properly followed the court's Pinkerton instruction and found that Rodríguez-Romero's possession of crack was reasonably foreseeable to Rodríguez and committed in furtherance of the conspiracy. See, e.g., United States v. Salley, 651 F.3d 159, 167 (1st Cir. 2011). We thus affirm Rodríguez's conviction on the substantive count of possession with intent to distribute crack.

However, the government has pointed us to no evidence on the record demonstrating that Rodríguez's co-conspirators committed the substantive acts of possessing with intent to distribute heroin and cocaine after Rodríguez turned eighteen. The government introduced general evidence that the drug point operated in 2008 and 2009, as well as specific evidence tying Rodríguez to heroin and cocaine before he turned eighteen, but neither of those will suffice to support jurisdiction. The government had the burden of introducing at trial, and highlighting on appeal, specific pieces of evidence, with dates, tying Rodríguez or his co-conspirators to the possession or distribution of heroin and cocaine at the drug point after August 18, 2008, when Rodríguez was released from

-21-

juvenile detention.[6] It has failed to do so. For the reasons discussed above, that omission is fatal, and the court thus lacked jurisdiction over Rodríguez with respect to the heroin and cocaine counts. See Vargas-De Jesús, 618 F.3d at 64-65.

Having reached that conclusion, we need not address in any detail Rodríguez's claim that the district court failed to instruct the jury that it could not hold Rodríguez liable for the substantive acts of his co-conspirators unless the jury first found that those acts occurred after Rodríguez turned eighteen. This claim now only applies to Rodríguez's convictions on the substantive crack and marijuana counts, since we are vacating his heroin and cocaine convictions. Though Rodríguez is correct, he failed to make the argument before the district court, so we review the instruction for plain error. See, e.g., Meadows, 571 F.3d at 145. Rodríguez has not cleared the high hurdle of plain error review, because he has failed to demonstrate a reasonable probability that, but for the error, the result of the district court proceeding would have been different. See United States v. Dominguez Benitez, 542 U.S. 74, 82 (2004); Vargas-De Jesús, 618 F.3d at 67. Though certainly not overwhelming, the evidence was sufficient to support Rodríguez's convictions on the crack and marijuana counts, regardless of the omitted instruction. See

---

[6] Because Rodríguez happens to have turned eighteen while in juvenile detention, we use his release date, rather than his eighteenth birthday, as his post-majority ratification date.

-22-

<u>Vargas-De Jesús</u>, 618 F.3d at 66-67 (affirming conspiracy conviction despite lack of jury instruction under plain error standard of review, because evidence was sufficient).

We thus affirm Rodríguez's convictions on Counts One, Three, and Five, and vacate his convictions on Counts Two and Four. That leaves only the question of whether to remand Rodríguez's case for resentencing. We choose to do so, because we find that the vacated counts may "alter the dimensions of the sentencing 'package,'" <u>United States</u> v. <u>Genao-Sánchez</u>, 525 F.3d 67, 71 (1st Cir. 2008), and that the district court should have the opportunity to consider whether a new sentence is warranted.[7] We therefore need not reach Rodríguez's remaining claim that the district court erred in calculating the amount of crack attributable to him as a result of his participation in the conspiracy.

## C. Rodríguez-Romero

Rodríguez-Romero raises two challenges to the district court's evidentiary rulings. First, he argues that the district court should have allowed him to introduce what he characterizes as impeachment evidence. Second, he claims that a portion of trial testimony was inadmissible hearsay and violated his rights under the Confrontation Clause. We review the district court's

---

[7] On remand, should the district court again choose to calculate Rodríguez's sentence based on his involvement with crack at the drug point, the court will of course have to apply the new Fair Sentencing Act guidelines. <u>See supra</u> note 1.

evidentiary rulings for abuse of discretion, though "we consider de novo whether the strictures of the Confrontation Clause have been met." United States v. Vega Molina, 407 F.3d 511, 522 (1st Cir. 2005). Where Rodríguez-Romero failed to object at trial, we review for plain error. See, e.g., United States v. Rodriguez, 525 F.3d 85, 95 (1st Cir. 2008) (failure to object on hearsay grounds results in plain error review); United States v. Luciano, 414 F.3d 174, 178 (1st Cir. 2005) (same for failure to object on Confrontation Clause grounds). Finding no abuse of discretion, and no violation of the Confrontation Clause, we affirm.

### 1. The impeachment testimony

Rodríguez-Romero's first argument is that the district court violated his constitutional right to present a complete defense by refusing to let him introduce extrinsic evidence that he claims "could have" impeached Police Officer Víctor M. Veguilla Figuero. On October 24, 2008, Veguilla arrested Rodríguez-Romero with 150 vials of crack outside a home in Guayama, Puerto Rico. Rodríguez-Romero had stopped in front of the house in a grey Ford Taurus.[8] Veguilla testified that he received an instruction to arrest Rodríguez-Romero from a colleague, Officer Pérez, who claimed to have witnessed Rodríguez-Romero conducting a drug sale

---

[8] Government witness Leonardo Martínez de León testified that he had seen Rodríguez-Romero at Carioca driving a grey Taurus.

-24-

with a co-conspirator named David de León.  On the same day, Pérez arrested David de León.

At trial, Rodríguez-Romero sought to introduce the testimony of Tomasa Colón-Pérez, David de León's mother and the owner of the house in front of which Rodríguez-Romero was arrested. The district court reviewed Colon-Pérez's testimony outside the presence of the jury.  Colon-Pérez's offer of proof was that, on the evening of October 24, 2008, she was sitting outside her house when police officers ran into her house and arrested her son, David.  She witnessed the officers handcuff her son, and then a female officer escorted her into a bedroom, where Colon-Pérez remained for a period of time.  She was allowed to exit the bedroom and kiss her son before the officers escorted him out of the house through the "door in the back of the room which leads to the yard." The officers then brought Colon-Pérez back into the bedroom.  About two hours went by, according to Colon-Pérez, at which point the officers standing in the bedroom with her said something to the effect of, "It's about to arrive.  It's about to arrive."  A few minutes later, the officers said, "It arrived.  The car arrived." Colon-Pérez then heard a voice in the house say, "David, David." From the bedroom, she could not see who was speaking, nor could she identify the voice.  Colón-Pérez was inside her home, could not see outside, and did not witness Rodríguez-Romero's arrest.

Though the offer of proof at trial was less than lucid, Rodríguez-Romero's attorney apparently sought to introduce Colon-Pérez's testimony in order to impeach Veguilla by showing that: (1) Officer Pérez could not have witnessed David de León and Rodríguez-Romero conducting a drug sale, because de León was already under arrest at that point; and (2) more generally, the events that day could not have transpired as Veguilla claimed they had, since de León was arrested two hours before Rodríguez-Romero.

Rodríguez-Romero's argument fails. Colón-Pérez did not witness the arrest of Rodríguez-Romero, which is the arrest Veguilla conducted and about which he testified. Colón-Pérez contradicted none of the specific events that Veguilla described in his testimony. Veguilla did not testify that the drug sale between de León and Rodríguez-Romero occurred outside Colón-Pérez's house, that de León and Rodríguez-Romero were immediately arrested following the sale,[9] or that de León was still present at the house when Veguilla arrested Rodríguez-Romero. Nor did Colón-Pérez see the car that was allegedly "arriving" such that she could establish that the activity she heard two hours after her son's arrest was indeed the arrest of Rodríguez-Romero.

---

[9] Veguilla testified that "after a surveillance that was rendered for me by fellow officer Perez, he indicated that we were to intervene." When asked whether he arrested Rodríguez-Romero at the same time that Pérez arrested de León, Veguilla said, "I couldn't tell you at the same time, but it was more or less relative."

-26-

Rodríguez-Romero argues that the exclusion of Colón-Pérez's testimony denied him "a meaningful opportunity to present a complete defense," a right the Constitution guarantees, "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment." Crane v. Kentucky, 476 U.S. 683, 690 (1986) (internal citation and quotation marks omitted). Yet a defendant's right to present relevant evidence in his own defense "is not unlimited, but rather is subject to reasonable restrictions." United States v. Scheffer, 523 U.S. 303, 308 (1998). See also Taylor v. Illinois, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."). A witness cannot testify to a matter unless there is evidence sufficient to support a finding that she has personal knowledge of the matter. Fed. R. Evid. 602. We fail to see how Colón-Pérez had sufficient personal knowledge to testify regarding Rodríguez-Romero's arrest, see id., nor do we understand how her testimony would have been relevant to impeach Veguilla, see Fed. R. Evid. 401, 403. We thus affirm.[10]

---

[10] Whether we view the exclusion of Colón-Pérez's testimony as an evidentiary ruling, reviewed for abuse of discretion, see, e.g., Vega Molina, 407 F.3d at 522, or a constitutional error, reviewed for harmlessness beyond a reasonable doubt, see, e.g., United States v. Catalán-Roman, 585 F.3d 453, 466 (1st Cir. 2009), we find no error.

-27-

## 2. The alleged hearsay statement

When asked why he arrested Rodríguez-Romero on October 24, 2008, Officer Veguilla testified that Officer Pérez had witnessed Rodríguez-Romero conducting a drug sale and had "indicated to me that we were to intervene." Pérez did not testify at trial and thus could not be cross-examined. Rodríguez-Romero's second argument is that Veguilla's testimony was inadmissible hearsay and that the admission of that testimony violated Rodríguez-Romero's rights under the Confrontation Clause. Rodríguez-Romero admits that plain error review applies to this claim, because he did not object to the testimony at trial, either on hearsay or Confrontation Clause grounds. Rodriguez, 525 F.3d at 95; Luciano, 414 F.3d at 178.

There was no error, because Veguilla's testimony was not hearsay. The government offered Pérez's out-of-court statement to explain why Veguilla had arrested Rodríguez-Romero, not as proof of the drug sale that Pérez allegedly witnessed. Out-of-court statements providing directions from one individual to another do not constitute hearsay. United States v. Bailey, 270 F.3d 83, 87 (1st Cir. 2001). And we need not address Rodríguez-Romero's Confrontation Clause argument. First, the argument is completely undeveloped in Rodríguez-Romero's brief, and he has thus abandoned it. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Second, even if we were to address the argument, and assuming that

-28-

Pérez's statement qualifies as "testimonial," the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford v. Washington, 541 U.S. 36, 59 n.9 (2004) (citing Tennessee v. Street, 471 U.S. 409, 414 (1985)).

Finding no merit to Rodríguez-Romero's claims, we affirm.

**D.  López-Capó**

López-Capó, who was alleged to be one of the owners of the crack distributed at Carioca, was found guilty of Counts One and Three (the conspiracy count and the substantive count of possessing crack with the intent to distribute it).  In addition to the claim addressed above, López-Capó challenges the sufficiency of the evidence against him and argues that the district court erred by:  (1) admitting hearsay statements of his co-conspirators; (2) admitting evidence of his relation to a known drug dealer; (3) admitting evidence of a riot that occurred in Carioca; (4) failing to give the jury a multiple conspiracy instruction; (5) imposing a two-point enhancement for obstruction of justice; (6) imposing a two-point enhancement under U.S.S.G. § 2D1.2(a)(1); and (7) sentencing him to 360 months' imprisonment, which he claims was not a reasonable sentence.  We affirm on all counts.[11]

---

[11] Because we find that the district court committed no error in its handling of López-Capó's case, we need not reach López-Capó's argument that the district court's individual errors

-29-

## 1. The sufficiency of the evidence

López-Capó first argues that the government failed to prove beyond a reasonable doubt that he participated in the drug conspiracy. We review de novo the district court's denial of López-Capó's Rule 29 motion, examining the evidence in the light most favorable to the verdict. Pérez-Meléndez, 599 F.3d at 40. A defendant challenging his conviction for insufficiency of the evidence faces an "uphill battle." United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000). We will affirm if a reasonable jury could have found the defendant guilty of every element of the charged crime beyond a reasonable doubt. Pérez-Meléndez, 599 F.3d at 40.

To prove conspiracy, the government must show that: (1) a conspiracy existed; (2) the defendant knew of the conspiracy; and (3) the defendant voluntarily participated in the conspiracy. United States v. Bristol-Martir, 570 F.3d 29, 39 (1st Cir. 2009). To prove that the defendant "belonged to and participated in the drug conspiracy, the government must show two kinds of intent: 'intent to agree and intent to commit the substantive offense.'" Id. (quoting Hernández, 218 F.3d at 65). The government can meet its burden with direct or circumstantial evidence. United States v. Sepulveda, 15 F.3d 1161, 1173 (1st Cir. 1993). López-Capó makes

cumulatively prejudiced him. See United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993).

a general allegation, supported by little argumentation and almost no case law, that the government failed to prove that he knew of an agreement to distribute drugs in Carioca.

We have recounted above just a portion of the evidence that a conspiracy to distribute drugs existed at Carioca from 2006 to 2009. The first element of the conspiracy test was undoubtedly met. The evidence was also sufficient for the jury to conclude that López-Capó knew of that conspiracy and voluntarily participated in it. First, co-conspirator Heriberto García-Román testified that López-Capó supplied the drug point with crack and that he had seen López-Capó deliver crack to another drug point employee. Second, co-conspirator Leonardo Martínez de León identified López-Capó as a runner of cocaine, crack, and heroin at the drug point and said that he had personally dealt drugs with López-Capó. Martínez de León also testified to having seen López-Capó at the drug point several times, delivering drugs and collecting money and tallies. Third, co-conspirator Yamil Irizarry-Lucas identified López-Capó as the supplier of crack for the drug point and testified that, on two occasions, he had picked up hundreds of vials of crack from López-Capó for sale at Carioca.

It is not for us to weigh this evidence or to make credibility determinations. Hernández, 218 F.3d at 64. A reasonable jury could have found López-Capó guilty of every element

of the conspiracy count beyond a reasonable doubt.  Pérez-Meléndez, 599 F.3d at 40.

### 2. The alleged hearsay statements

López-Capó's next claim is that various statements made by his co-conspirators and admitted at trial were inadmissible hearsay.  Because López-Capó preserved his challenge to the district court's admission of these statements, we review for abuse of discretion.  Vázquez-Botet, 532 F.3d at 65.  Finding none, we affirm.

López-Capó argues that the district court erred by admitting four statements, one made by García-Román and three made by Martínez de León.  García-Román testified that Suki and Cesar, the alleged owners of the drug point, had told him that López-Capó brought drugs to Carioca from the "metropolitan area."  Martínez de León testified that: (1) Edwin Casiano-Roque, another co-conspirator, had instructed him to collect the tallies for López-Capó; (2) Casiano-Roque had told him that López-Capó lived in the metropolitan area; and (3) Suki had said that López-Capó cooked better crack than Cesar.[12]

_____

[12] López-Capó also objects to Irizarry-Lucas's testimony that López-Capó supplied crack to the drug point, which Irizarry-Lucas said he knew because he had personally picked up crack from López-Capó on two occasions for delivery to Carioca.  We need not address these statements, as Irizarry-Lucas made them while he was testifying at trial, and they therefore do not qualify as hearsay. See Fed. R. Evid. 801(c)(1).

Statements made by a defendant's co-conspirators "during and in furtherance of the conspiracy" do not qualify as hearsay under Federal Rule of Evidence 801(d)(2)(E).  A district court faced with a challenge to the admission of a co-conspirator's statement must provisionally admit the statement and then wait until the end of the trial to consider whether, in light of all the evidence, the following four conditions are satisfied by a preponderance of the evidence: (1) a conspiracy existed; (2) the defendant was a member of the conspiracy; (3) the declarant was also a member of the conspiracy; and (4) the declarant's statement was made in furtherance of the conspiracy. Vázquez-Botet, 532 F.3d at 65; United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977).

Addressing the first two elements of the test, we have outlined the evidence that a conspiracy to distribute drugs operated at Carioca and that López-Capó was a member of that conspiracy.  We thus need only address whether the declarants were also members of the conspiracy and whether their statements were made in furtherance of the conspiracy.  The declarants' statements alone cannot satisfy the preponderance of the evidence standard; there must be some independent corroboration to allow admission. United States v. Portela, 167 F.3d 687, 703 (1st Cir. 1999).

Evidence other than the out-of-court statements themselves established by a preponderance of the evidence that all

of the declarants at issue – Suki, Cesar, and Casiano-Roque – were members of the conspiracy. Multiple witnesses identified Suki and Cesar as "co-owners" of the drug point and testified to their activity at the drug point. As for Casiano-Roque, Martínez de León testified that Casiano-Roque had paid him $125.00 per week as a runner, and Officer Veguilla testified to having arrested Casiano-Roque with Rodríguez-Romero during a drug sale.

The evidence was also sufficient for the district court to find that all of the relevant statements were made in furtherance of the conspiracy. When Suki and Cesar told García-Román that López-Capó brought drugs to Carioca, those were statements identifying other members of the conspiracy, made in furtherance of the conspiracy. See United States v. Pelletier, 845 F.2d 1126, 1128-29 (1st Cir. 1988). Casiano-Roque's statement instructing Martínez de León to collect the tallies from the sellers was a statement related to the operation of the conspiracy, made in furtherance of the conspiracy. See United States v. Rodríguez-Vélez, 597 F.3d 32, 40-41 (1st Cir. 2010). Since Martínez de León knew that the crack for the drug point was supplied from the metropolitan area, Casiano-Roque's statement that López-Capó lived in the metropolitan area was a statement related to the inventory of the drug point, made in furtherance of the conspiracy. Id. Finally, Suki's statement to Martínez de León that López-Capó cooked better crack than Cesar was a statement

identifying other members of the conspiracy, again made in furtherance of the conspiracy. Pelletier, 845 F.2d at 1128-29.

The district court did not abuse its discretion by admitting the out-of-court statements of López-Capó's co-conspirators.

### 3. The other evidentiary rulings

López-Capó also argues that he was unfairly prejudiced when the district court: (1) allowed the government to question him about his relationship with his cousin, a known drug dealer, when López-Capó took the stand; and (2) admitted evidence of a riot at Carioca at which López-Capó was not present. Again, we review evidentiary rulings for abuse of discretion. See, e.g., Vega Molina, 407 F.3d at 522.

Federal Rule of Evidence 403 allows a district court to exclude relevant evidence when its probative value is substantially outweighed by its prejudicial effect. "Because Rule 403 judgments are typically battlefield determinations, and great deference is owed to the trial court's superior coign of vantage, only rarely – and in extraordinarily compelling circumstances – will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." United States v. Bunchan, 580 F.3d 66, 71 (1st Cir. 2009) (internal citation and quotation marks omitted). This is not such an instance.

The district court allowed the government to ask López-Capó two questions regarding his familial relationship with Alexander Capo Trujillo during its cross-examination of López-Capó. First, the government asked whether López-Capó knew Trujillo; López-Capó responded that he did. Second, the government asked what López-Capó's relationship with Trujillo was; López-Capó responded that Trujillo was his cousin. On appeal, López-Capó argues that these questions were irrelevant and unfairly prejudicial because Trujillo was a "drug kingpin" and "a well known federal fugitive whose names [sic] was in the Puerto Rico press with great frequency." Thus, López-Capó argues, the questions made "more credible the possibility that [López-Capó] was a member of a drug conspiracy." The district court found the evidence admissible after the government explained that it had reason to believe that López-Capó had "inherited all the contacts of Alex Trujillo once Alex Trujillo got arrested by the Federal government." The record establishes that the court considered both the relevance and the prejudicial effect of the evidence, and we find no abuse of discretion in the court's decision to admit it. Furthermore, while this is not the kind of extraordinarily compelling circumstance in which we might reverse a district court's Rule 403 judgment, even if it were, any error would likely be harmless, given the ample evidence against López-Capó. <u>See</u> <u>United States</u> v. <u>Piper</u>, 298 F.3d

47, 56 (1st Cir. 2002) (an error is harmless if it is "highly probable that the error did not influence the verdict").

Nor did the district court abuse its discretion by allowing Police Officer Pedro Flores-Sánchez to testify about a riot that occurred at Carioca in September 2006. The government argued that the riot evidence was relevant to show the dangerousness of Carioca, in support of Count Six of the indictment (conspiring to use firearms to carry out drug crimes), and we agree. Flores-Sánchez did not testify that López-Capó was present at the riot, or that he was in any way associated with the riot. We thus fail to see how López-Capó could have been prejudiced by the testimony. See Fed. R. Evid. 403.

### 4. The multiple conspiracy instruction

Next, López-Capó argues that the district court erred by refusing to give the jury a multiple conspiracy instruction, which would have allowed the jury to find that López-Capó participated in a different conspiracy than Díaz, Rodríguez, and Rodríguez-Romero. We review the district court's decision not to provide the jury instruction for abuse of discretion. United States v. De La Cruz, 514 F.3d 121, 139 (1st Cir. 2008).

A district court should give a multiple conspiracy instruction when a reasonable jury could find more than one illicit agreement, or an illicit agreement other than the one charged, based upon the evidence put forward at trial. United States v.

Balthazard, 360 F.3d 309, 315-16 (1st Cir. 2004). We will reverse a district court's decision not to provide a multiple conspiracy instruction only if the defendant can show that he suffered substantial prejudice. De La Cruz, 514 F.3d at 139. "In the context of alleged multiple conspiracies, the defendant's main concern is that jurors will be misled into attributing guilt to a particular defendant based on evidence presented against others who were involved in a different and separate conspiratorial scheme." United States v. Brandon, 17 F.3d 409, 450 (1st Cir. 1994).

It was only after the district court finished instructing the jury that Díaz requested a multiple conspiracy instruction, and López-Capó joined in that request. Although López-Capó did submit a written request for a jury instruction, asking the court to instruct the jury regarding the weight they should give his criminal record, that motion contained no mention of a multiple conspiracy instruction. López-Capó's motion belies his claim that the court gave him no opportunity to request the multiple conspiracy instruction, which is his excuse for failing to comply with Federal Rule of Criminal Procedure 30.

Because we find that López-Capó's claim fails on its merits, however, we need not decide whether López-Capó forfeited that claim as a result of his failure to comply with Rule 30. See, e.g., United States v. Upton, 559 F.3d 3, 9 (1st Cir. 2009) ("The right to a jury instruction can be waived by not requesting the

instruction, or not objecting at the proper time."). López-Capó has pointed to no evidence in the record indicating that a reasonable jury could have found that he participated in an illicit agreement other than the one charged. Rather, the evidence established that López-Capó participated in the very same conspiracy to distribute drugs at Carioca as his co-defendants.

López-Capó seems to argue that a multiple conspiracy instruction was necessary because the evidence failed to establish that he participated in the Carioca drug point in 2009.[13] Even assuming that is true, we do not see why it would necessitate a multiple conspiracy instruction. A conspiracy with "a continuity of purpose and a continued performance of acts . . . is presumed to exist until there has been an affirmative showing that it has terminated." United States v. Elwell, 984 F.2d 1289, 1293 (1st Cir. 1993) (citation and internal quotation marks omitted). The trial testimony established that this conspiracy operated continuously between 2006 and 2009 and that López-Capó was active in the drug point at least in 2007 and 2008. López-Capó has put

---

[13] López-Capó also claims that the evidence was insufficient to show that he participated in the drug point in 2006. But García-Román, who was active in the drug point between September 2006 and April 2007, testified that he saw López-Capó at the drug point on two or three occasions "between the month of November [2006] and the month of February [2007]." Furthermore, even if López-Capó did not join the conspiracy until after 2006, we fail to see why that would require a multiple conspiracy instruction, though it would be relevant for sentencing purposes. See, e.g., United States v. Rodríguez-González, 433 F.3d 165, 168-69 (1st Cir. 2005).

forward no evidence that he acted "affirmatively either to defeat or disavow the purposes of the conspiracy" in 2009. United States v. Juodakis, 834 F.2d 1099, 1102 (1st Cir. 1987). Nor does he provide any support for his conclusory claim that the lack of a multiple conspiracy instruction "made it difficult for the jury to believe [his] testimony and arguments that he was not involved in the conspiracy." There was no abuse of discretion.

### 5. **The alleged sentencing errors**

Finally, López-Capó argues that the district court committed four errors at sentencing. We review the district court's factual findings made at sentencing for clear error. United States v. Shinderman, 515 F.3d 5, 18 (1st Cir. 2008). We review the reasonableness of the defendant's resulting sentence for abuse of discretion. Gall v. United States, 552 U.S. 38, 41 (2007); United States v. Bunchan, 626 F.3d 29, 35 (1st Cir. 2010).

At sentencing, the district court found that López-Capó was responsible for at least 1.5 kilograms of crack, which resulted in a base offense level of 36. See U.S.S.G. § 2D1.1(c) (amended 2011).[14] The court then added two enhancements: one for obstruction of justice, see U.S.S.G. § 3C1.1, and one for drug activity near a protected area, see U.S.S.G. § 2D1.2(a)(1), which yielded an adjusted offense level of 40. Using a CHC of III, the court

---

[14] Under the new guidelines, as amended by the Fair Sentencing Act of 2010, López-Capó's base offense level would be 34. See U.S.S.G. § 2D1.1(c).

determined that López-Capó's sentencing guideline range was 360 months to life. The court imposed a sentence at the bottom of that range: 360 months (thirty years) of imprisonment, followed by ten years of supervised release.

First, López-Capó argues that the district court committed clear error by applying the two-point enhancement for obstruction of justice. The sentencing guidelines allow the court to increase a defendant's offense level by two points if he has willfully obstructed justice, U.S.S.G. § 3C1.1, which includes perjury, United States v. Dunnigan, 507 U.S. 87, 92-94 (1993). A defendant commits perjury when he intentionally gives false testimony under oath on a matter material to the proceedings. Shinderman, 515 F.3d at 19. To impose an enhancement for perjury, the "sentencing court must make an independent finding that the elements of perjury have been satisfied." Id.

The district court here applied the enhancement after concluding that López-Capó's testimony had been a complete fabrication. The court's findings sufficed to establish that the elements of perjury were met. Id. López-Capó's testimony occurred under oath, in court, and he addressed various matters material to the proceedings. Id. The court found that López-Capó had intentionally fabricated his testimony in an attempt to convince the jury that he had been "a student, living off little amounts, just making ends meet," who knew none of the cooperating witnesses

-41-

and only traveled to Carioca to see his mother. López-Capó had "lied through his teeth," the court found, by portraying "a world different from Carioca, the world in which he participated, and the world . . . he was supplying narcotics to." When López-Capó's attorney asked, at sentencing, for the "specific instances" in which López-Capó had lied, the court responded, "[h]is whole testimony [was] a big lie." Having reviewed the record, we cannot say we disagree. Where a district court finds that a defendant has fabricated his entire testimony, the court need not delineate every specific instance in which the defendant lied. But here, the court did specifically mention López-Capó's visual expressions and demeanor on the stand, as well as his financial records, which the court found were "totally at odds with the testimony that he was portraying." We give those credibility assessments "reasonable latitude." Shinderman, 515 F.3d at 19. There was no clear error.

Second, López-Capó argues that the district court erred by enhancing his offense level for committing a drug offense near a protected area, pursuant to U.S.S.G. § 2D1.2(a)(1). López-Capó bases this challenge on the government's alleged failure to establish the 1,000-foot requirement or the existence of a protected area. As discussed above, we reject that argument. The evidence was sufficient for the jury, and the district court, to conclude that the relevant activity occurred within 1,000 feet of a protected area. As the court stated at sentencing, it was

"evident from the evidence" that "the drug point operated on top almost of the children's playground" and that the drug offenses occurred "in the Public Housing Project." Again, there was no clear error.

Third, López-Capó claims that his sentence was unreasonable because the district court included two "recency" criminal history points when calculating his CHC, as was then required by U.S.S.G. § 4A1.1(e), which was subsequently amended.[15] The government's brief entirely fails to address this argument. In López-Capó's pre-sentence investigation report (PSI), the U.S. Probation Office assigned him three criminal history points as a result of his prior criminal activity, to which the Probation Office added two points because López-Capó had committed the instant offense fewer than two years after being released from prison. See U.S.S.G. § 4A1.1(e) (amended 2010). Five criminal history points resulted in a CHC of III, which is what the court used to calculate López-Capó's sentence. López-Capó argues that he should only have been assigned two criminal history points, which would have resulted in a CHC of II.

---

[15] At the time of López-Capó's sentencing, section 4A1.1(e) required a district court to assign a defendant two extra criminal history points if the defendant committed "any part of the instant offense (i.e., any relevant conduct) less than two years following release from confinement on a sentence counted under § 4A1.1(a) or (b)." See U.S.S.G. § 4A1.1(e) (amended 2010).

López-Capó was sentenced on April 30, 2010. The U.S. Sentencing Commission had voted earlier that month, on April 7, 2010, to eliminate the "recency" points required by section 4A1.1(e), but the proposed amendment ("Amendment 742") did not become effective until November 1, 2010. See United States v. Adams, 640 F.3d 41, 42 (1st Cir. 2011). Amendment 742 is not retroactive. See U.S.S.G. § 1B1.10(c). And while "we have previously remanded cases for reconsideration of a sentence in light of a later amendment to the guidelines . . . even where that amendment had not been made retroactive," we have chosen not to do so where "the district court was made aware at sentencing of the proposed guideline amendment and . . . was unmoved by the prospect of the elimination of the 'recency' points." Adams, 640 F.3d at 43. López-Capó filed objections to the PSI, which included notification to the court that the U.S. Sentencing Commission had proposed to amend section 4A1.1(e), and he reiterated at sentencing his objection to the CHC calculation. López-Capó has not distinguished Adams or provided us with any reason to believe that a different result would follow on remand. See id. There was no abuse of discretion.

Fourth, López-Capó argues that his sentence was unreasonable because the district court did not properly consider the 18 U.S.C. § 3553(a) factors to determine whether a downward departure from the sentencing guidelines was warranted. This

argument seems to have two prongs: (1) the district court failed to adequately explain why it was denying López-Capó's request for a downward departure; and (2) López-Capó's co-defendants received much shorter sentences than he did.  Both claims fail.

Addressing the first contention, particularly where the district court sentences a defendant within the guideline range, as was the case here, the court's explanation of the sentence need not "be precise to the point of pedantry," United States v. Turbides-Leonardo, 468 F.3d 34, 40 (1st Cir. 2006), and "brevity is not to be confused with inattention," id. at 42.  López-Capó provides no actual support for his claim that "it is fair to say that there is no evidence that the District Court examined the factors in 18 U.S.C. § 3553(a)(1) through (5)."  Our review of the sentencing hearing transcript reveals that the district court considered the PSI, as well as the arguments of both López-Capó and the government.  The court carefully explained its calculation of López-Capó's offense level, choosing "for the sake of being fair" to attribute 1.5 kilograms of crack to López-Capó, though the court had "no doubt" that López-Capó was "responsible for at least 4.5 kilograms of crack."  The court then rejected the government's request for a sentence at the "upper end" of the guideline range (meaning life imprisonment), found that "[t]he guidelines, although advisory, adequately reflect the nature of the offence and the characteristics," and noted that the defendant "has not given the

Court any . . . explanation other than the fact that we have the wrong person basically, that he didn't do it."  Thus, the court found that there was "nothing on th[e] record" that would lead it "to give [López-Capó] the benefit of a different calculation under 3553(a)."  We find the explanation adequate.  See Rita v. United States, 551 U.S. 338, 356 (2007) ("[W]hen a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation."); Turbides-Leonardo, 468 F.3d at 40-42.

We also reject López-Capó's claim that his sentence was unreasonable because he received a longer sentence than any of his co-defendants.  First, López-Capó provides no argumentation or case law in support of the assertion.  See Zannino, 895 F.2d at 17 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  Second, López-Capó raised this issue at sentencing, arguing that Rodríguez had only received a sentence of 188 months.  The district court responded that Rodríguez had started with the same base offense level as López-Capó but had a lower CHC and fewer enhancements.  "[W]here the defendant's own sentence has been justified and the basis for a co-defendant's lesser sentence is set forth or is apparent, no more precise calibration of the difference between them is customarily feasible, let alone required."  United States v. Mueffelman, 470 F.3d 33, 41 (1st Cir. 2006).

## III. Conclusion

For the foregoing reasons, we affirm the convictions of Díaz, Rodríguez-Romero, and López-Capó. As for Rodríguez, we affirm his convictions on Counts One, Three, and Five, vacate his convictions on Counts Two and Four, and remand for a new sentencing hearing in light of this opinion.